788 A.2d 736

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
FELICIA STOVALL, DEFENDANT–RESPONDENT.

Argued September 10, 2001—Decided January 28, 2002.

*Casey J. Woodruff,* Assistant Prosecutor, argued the cause for appellant (*Thomas V. Manahan,* Union County Prosecutor, attorney; *Mr. Woodruff* and *Steven J. Kaflowitz,* Assistant Prosecutor, on the briefs).

*Joseph Charles* argued the cause for respondent (*Ashley and Charles*, attorneys).

*Robert E. Bonpietro*, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*John J. Farmer, Jr.*, Attorney General, attorney).

*Linda Mehling*, Assistant Deputy Public Defender, argued the cause for amicus curiae Office of the Public Defender (*Peter A. Garcia*, Acting Public Defender, attorney).

The opinion of the Court was delivered by

ZAZZALI, J.

This appeal requires the Court to determine the legality of a police investigatory stop. Specifically, we must decide whether a law enforcement officer had reasonable suspicion to conclude that a suspect at Newark International Airport was transporting narcotics. The Appellate Division held that the officer was not justified in that conclusion, and affirmed the trial court's suppression of the drugs seized as a result of defendant's detention and subsequent arrest. We disagree. Upon review of the totality of the circumstances, we conclude that the officer had reasonable suspicion that defendant was transporting narcotics and therefore was justified in detaining defendant.

I

The Port Authority of New York and New Jersey (Port Authority) is charged with the operation of Newark International Airport. The Port Authority employs numerous law enforcement officers including Detective Charles Benoit. Detective Benoit is a narcotics interdiction Task Force Officer who primarily works at Newark Airport. At the time of this incident, Benoit was "on loan" from the Port Authority to the United States Drug Enforcement Agency (DEA).

On May 31, 1998, Detective Benoit received an electronic page from DEA Agent Scott Cahill in Los Angeles. Agent Cahill

informed Detective Benoit that an American Airlines ticket agent at Los Angeles International Airport had informed Cahill that two potential drug couriers were aboard American Airlines Flight 114 from Los Angeles to Newark. According to the ticket agent, two female suspects had checked in using "fraudulent" or "questionable" identification. Agent Cahill also informed Detective Benoit that one of the suspects was traveling under the name "Roberta Chambers." He further stated that although the suspects' tickets had been purchased at the same time from the same agency, the two women were traveling separately and did not appear to know each other. Agent Cahill described the suspects as "possibly Hispanic." Both women were in their mid-twenties and were wearing "business type suit[s]." Both carried black "crew-type bags," or tote bags with wheels that are pulled by a handle. One woman, later identified as defendant, had short hair, wore red, and had a return ticket for June 10. The other woman was wearing a plaid skirt and had longer hair.

Agent Cahill told Detective Benoit that the tickets were purchased through International Mirmar Travel. Detective Benoit testified that he previously had arrested drug traffickers with tickets purchased from that agency.

Detective Benoit also testified that in the past he had received information "of this nature ... [n]umerous times, dozens of times." Thus, on receipt of the information, Detective Benoit notified his partner, Detective Jim Kane, and met him at their office in Newark Airport. The two officers confirmed the flight's arrival time, obtained the services of a Spanish-speaking officer, and notified K-9 Port Authority Police Officer Thomas Hering to "stand by." Detectives Benoit and Kane then proceeded to the American Airlines terminal and waited for Flight 114 to arrive.

As passengers disembarked, Detective Benoit noticed two women matching the general descriptions provided by Agent Cahill. Although the women emerged from the jetway at different times, both were pulling small, black tote bags on wheels, and appeared to be "the same age or approximately the same age" as the women

described by Agent Cahill. According to Detective Benoit, drug couriers prefer carry-on luggage because "check-in" luggage might be subject to handling by others and because K–9 units are regularly posted in the baggage handling area. Although matching Agent Cahill's general descriptions, the women were African–American, not Hispanic.[1]

As the women proceeded to leave the terminal, Detective Benoit followed defendant and Detective Kane pursued the other suspect. Detective Benoit approached defendant, identified himself as a police officer, and "asked for permission to speak with her." Defendant asked Benoit where he would like to speak with her and he replied that where they were was fine. Detective Benoit then asked defendant where her flight originated and defendant responded "Los Angeles." At his request, defendant produced her airline ticket bearing the name "Roberta Chambers." Detective Benoit recognized the name as one of the names provided by Agent Cahill. Benoit also noticed that defendant had a "bulk" ticket. According to Detective Benoit, narcotics suppliers often purchase such tickets, which are available at a discounted rate because they are purchased in "bulk." Those tickets are then distributed to individual couriers in an effort to save money and avoid detection.

After examining defendant's ticket, Detective Benoit returned it to her and asked for identification. Defendant presented him with a California state identification card bearing the name "Roberta Chambers" and listed an address on Main Street in Los Angeles, California. Detective Benoit testified that he found it "unusual" that a state identification card was defendant's sole form of identification because "most people carry more substantial identification, specifically a driver's license." Benoit also found the

---

[1] The identification of the suspects as Hispanic was only that, an identification. Defendant has not alleged that racial profiling, *i.e.*, any action taken by a law enforcement officer that is impermissibly based on race, occurred here, arguing only that she does not match the description given by Agent Cahill because she is African–American.

identification suspicious because the card had expired. He returned the card and asked defendant for her local destination. Defendant told Detective Benoit that she was traveling to New York to visit her boyfriend. Detective Benoit then asked if the luggage she was carrying belonged to her, whether she had packed the bags, and whether she knew what the bags contained. Defendant responded affirmatively to all three questions. Detective Benoit testified that during his conversation with defendant, defendant was "noticeabl[y]" nervous and her hand shook.

After several minutes, defendant asked Detective Benoit why he was asking her questions. Detective Benoit informed defendant that he was a member of a narcotics interdiction team and that he suspected that she was carrying drugs. He then requested permission to search her suitcase and informed defendant of her right to refuse consent. Defendant refused and told Detective Benoit that she wanted to leave. In response, Detective Benoit asked her if she "could [ ] please stand by one minute," but defendant reiterated that she wanted to leave. Detective Benoit then said "this will just take a few moments." Defendant did not react.

At that point, Detective Benoit was focused on defendant, while Officer Kane was speaking with the other suspect several feet away. Detective Benoit called for the K–9 unit, which arrived shortly thereafter. The officers placed defendant's luggage on the ground and the dog "alerted," indicating the presence of narcotics. Consequently, the officers took defendant into custody and advised her of their intention to seek a warrant to search her bag. Defendant then admitted that her real name was Felicia Stovall and consented to a search of her bag. Before searching the bag, the officers contacted the Union County Prosecutor who informed them that defendant could still change her mind. The officers so informed defendant, stating "you don't have to allow us into the bag." Defendant nonetheless gave permission to search her bag and signed a consent form. A search of defendant's luggage yielded three bundles of marijuana totaling approximately forty-seven pounds.

Defendant subsequently was indicted for possession of a controlled dangerous substance, contrary to *N.J.S.A.* 2C:35–10a(3), and possession of twenty-five pounds or more of a controlled dangerous substance with intent to distribute, contrary to *N.J.S.A.* 2C:35–5a(1) and *N.J.S.A.* 2C:35–5b(10)(a). Defendant moved to suppress the seized evidence. Defendant neither testified nor presented witnesses at the suppression hearing, and did not file an affidavit in support of the motion. The trial court nevertheless granted defendant's motion and the State appealed. In an unpublished *per curiam* opinion, the Appellate Division affirmed. We granted leave to appeal, *State v. Stovall*, 165 *N.J.* 596, 762 *A.*2d 214 (2000), and now reverse.

## II

As a threshold matter, we consider whether Benoit "seized" defendant within the meaning of the Fourth Amendment to the United States Constitution and Article 1, paragraph 7 of the New Jersey Constitution. Both constitutions protect a person's right to be free from unreasonable searches and seizures. *U.S. Const.* amend. IV; *N.J. Const.* art. I, ¶ 7. In determining whether a seizure occurred, a court must consider whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *United States v. Mendenhall*, 446 *U.S.* 544, 554, 100 *S.Ct.* 1870, 1877, 64 *L.Ed.*2d 497, 509 (1980); *see also INS v. Delgado*, 466 *U.S.* 210, 216–17, 104 *S.Ct.* 1758, 1763, 80 *L.Ed.*2d 247, 255 (1984) (stating that no detention occurs under Fourth Amendment unless circumstances of encounter demonstrate that reasonable person would not feel free to leave); *State v. Tucker*, 136 *N.J.* 158, 165, 642 *A.*2d 401 (1994) (noting that whether persons are seized "depends on an objective analysis of all the circumstances of their encounter" with police); *State v. Davis*, 104 *N.J.* 490, 498, 517 *A.*2d 859 (1986) (stating that court must consider totality of circumstances surrounding detention).

Even a brief detention can constitute a seizure. *Terry v. Ohio*, 392 *U.S.* 1, 16, 88 *S.Ct.* 1868, 1877, 20 *L.Ed.*2d 889, 903 (1968). However, "[t]he police do not violate the fourth amendment by 'merely approaching an individual on the street or in another public place, by asking him [or her] if he [or she] is willing to answer some questions....' " *Davis, supra,* 104 *N.J.* at 497, 517 *A.*2d 859 (quoting *Florida v. Royer,* 460 *U.S.* 491, 497, 103 *S.Ct.* 1319, 1324, 75 *L.Ed.*2d 229, 236 (1983)). On the other hand, "mere field interrogation" is constitutional "so long as the officer does not deny the individual the right to move." *State v. Sheffield,* 62 *N.J.* 441, 447, 303 *A.*2d 68, *cert. denied,* 414 *U.S.* 876, 94 *S.Ct.* 83, 38 *L.Ed.*2d 121 (1973). A police officer may conduct an investigatory stop if, based on the totality of the circumstances, the officer had a reasonable and particularized suspicion to believe that an individual has just engaged in, or was about to engage in, criminal activity. *Terry, supra,* 392 *U.S.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906. This Court has upheld the constitutionality of a temporary street detention based on less than probable cause. *Tucker, supra,* 136 *N.J.* at 167, 642 *A.*2d 401; *accord State v. Maryland,* 167 *N.J.* 471, 487, 771 *A.*2d 1220 (2001); *State v. Caldwell,* 158 *N.J.* 452, 458, 730 *A.*2d 352 (1999); *State v. Arthur,* 149 *N.J.* 1, 8, 691 *A.*2d 808 (1997); *Davis, supra,* 104 *N.J.* at 504, 517 *A.*2d 859; *Sheffield, supra,* 62 *N.J.* at 446, 303 *A.*2d 68.

Reasonable suspicion necessary to justify an investigatory stop is a lower standard than the probable cause necessary to sustain an arrest. *State v. Citarella,* 154 *N.J.* 272, 279, 712 *A.*2d 1096 (1998); *Arthur, supra,* 149 *N.J.* at 8, 691 *A.*2d 808. However, reasonable suspicion is neither easily defined nor "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 *U.S.* 213, 232, 103 *S.Ct.* 2317, 2329, 76 *L.Ed.*2d 527, 544 (1983). The United States Supreme Court has defined reasonable suspicion as " 'a particularized and objective basis for suspecting the person stopped of criminal activity.' " *Ornelas v. United States,* 517 *U.S.* 690, 696, 116 *S.Ct.* 1657, 1661, 134 *L.Ed.*2d 911, 918 (1996) (quoting *United States v. Cortez,* 449 *U.S.* 411, 417–18, 101 *S.Ct.*

690, 695, 66 *L.Ed.*2d 621, 629 (1981)). In justifying an investigatory detention based on reasonable suspicion, a police officer must "be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sokolow,* 490 *U.S.* 1, 7, 109 *S.Ct.* 1581, 1585, 104 *L.Ed.*2d 1, 10 (1989) (quoting *Terry, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909). "The principal components of a determination of reasonable suspicion ... [are] the events which occurred leading up to the stop ..., and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion...." *Ornelas, supra,* 517 *U.S.* at 696, 116 *S.Ct.* at 1661–62, 134 *L.Ed.*2d at 919.

## III

### A

■ We agree with the trial court and the Appellate Division that Detective Benoit "seized" defendant. The trial court stated:

> At first this was an encounter between [defendant] and Detective Benoit. However, once [defendant] said that she wanted to leave and her bag could not be searched it became a stop. She would not have felt free to leave because he said she had to wait. It's not a question of how long that period was, just that it occurred, and her bag was seized against her will.

The Appellate Division agreed with that conclusion.

Detective Benoit followed defendant after she disembarked from the plane and approached her. We note that his initial stop and questioning of defendant was permissible. *State v. Green,* 346 *N.J.Super.* 87, 96, 787 *A.*2d 186 (App.Div.2001). However, he then examined defendant's plane ticket and identification, informed her that he was a narcotics interdiction officer and that he suspected her of drug trafficking, and requested defendant's consent to search her luggage. Defendant refused and told him that she wanted to leave. Detective Benoit then "asked her could she please stand by one minute." Defendant repeated that she wanted to leave, and he told her "this will just take a few moments."

In light of these circumstances, an objectively reasonable person would not have felt free to leave. See W.R. LaFave, 4 *Search and Seizure* § 9.3(a), at 102–03 (3d ed. 1996) ("[A]n encounter becomes a seizure if the officer engages in conduct which a reasonable [person] would view as threatening or offensive even if performed by another private citizen. This would include such tactics as pursuing a person who has attempted to terminate the contact by departing, [or by] continuing to interrogate a person who has clearly expressed a desire not to cooperate . . . .") (footnotes omitted). Although Detective Benoit framed his first statement as a request rather than a command, the fact that defendant expressed her desire to leave and he did not allow her to do so demonstrates that defendant was not free to leave. Moreover, Detective Benoit's statement that "this will just take a few moments," implied that he would not have permitted defendant to leave. Accordingly, we find that Detective Benoit's detention of defendant, however brief, constituted a seizure.

### B

The more critical issue, and closer question, is whether Detective Benoit's "seizure" of defendant was constitutionally justified. Both the trial court and the Appellate Division held that Detective Benoit's detention of defendant at Newark International Airport was unconstitutional, concluding that he impermissibly relied on a "drug courier profile." We disagree. Nothing in the record indicates that Detective Benoit relied on a "drug courier profile." Even if he had, however, the characteristics contained in such a profile are permissible factors to be considered in the totality of the circumstances analysis of reasonable suspicion. See *Sokolow, supra,* 490 *U.S.* at 10, 109 *S.Ct.* at 1587, 104 *L. Ed.*2d at 12; *Green, supra,* 346 *N.J.Super.* at 98, 787 *A.*2d 186; *State v. Patterson,* 270 *N.J.Super.* 550, 557–60, 637 *A.*2d 593 (Law Div.1993), *aff'd o.b.,* 270 *N.J.Super.* 562, 637 *A.*2d 599 (App.Div.1994).

A "drug courier profile" is a "compilation[ ] of objective factors which may be innocent alone, but in conjunction with each other or

other facts, lead officers to believe that the suspect is engaging in drug trafficking." Kimberly J. Winbush, Annotation, *Propriety of Stop and Search by Law Enforcement Officers Based Solely on Drug Courier Profile*, 37 *A.L.R.* 5th 1, 11 (1996); *see also* LaFave, *supra*, § 9.4(e), at 166 (describing federal DEA "drug courier profiles" and their use in detaining and arresting suspected drug traffickers at airports). Many courts have addressed the utility of drug courier profiles in the context of the reasonable suspicion analysis. In general, most courts consider those factors actually exhibited by a suspect to determine if they collectively demonstrate reasonable suspicion, without accepting any set or combination of factors as demonstrating reasonable suspicion *per se.* LaFave, *supra*, § 9.4(e), at 174. Although it has not addressed the specific question whether drug courier profiles alone can provide a basis for reasonable suspicion, the United States Supreme Court has approved the use of profile characteristics in the totality of circumstances analysis of reasonable suspicion. See *Sokolow, supra*, 490 *U.S.* at 10, 109 *S.Ct.* at 1587, 104 *L.Ed.*2d at 12 (holding that because officer's reasonable articulable suspicion may be comprised of factors also included in drug courier profile that "does not somehow detract from [those factors'] evidentiary significance as seen by a trained agent").

State courts that have addressed this issue have held similarly. *See, e.g., State v. Martinson,* 581 *N.W.*2d 846, 851 (Minn.1998) (holding that police may rely on characteristics that can be labeled drug courier profile factors in determining whether reasonable suspicion exists); *Commonwealth v. Bennett,* 412 *Pa.Super.* 603, 604 *A.*2d 276, 284 (1992) (holding that "[a] match between the so-called profile and characteristics exhibited by a defendant does not, in and of itself, create a reasonable suspicion sufficient to justify an investigatory stop" (quoting *United States v. Hanson,* 801 *F.*2d 757, 762 (5th Cir.1986))); *cf. State v. Casey,* 59 *N.C.App.* 99, 296 *S.E.*2d 473, 480 (1982) (approving use of drug courier profile as basis for investigatory stops). Similarly, New Jersey courts have recognized that characteristics included in drug courier profiles are legitimate factors to be considered in the reason-

able suspicion analysis. See *Patterson, supra,* 270 *N.J.Super.* at 557, 637 *A.2d* 593 ("[P]rovided that suspicions which are directed at specific individuals arise, the police may develop and rely upon a so-called 'profile.' ").

■ A "drug courier profile" is merely a shorthand way of referring to a group of characteristics that may indicate that a person is a drug courier. However, the mere fact that a suspect displays profile characteristics does not justify a stop. See *State ex. rel. J.G.,* 320 *N.J.Super.* 21, 33, 726 *A.2d* 948 (App.Div.1999) (finding street detention unjustified where officer's hunch was based on profile factors and not specific overt conduct by defendants); *State v. Kuhn,* 213 *N.J.Super.* 275, 281 n. 1, 517 *A.2d* 162 (App.Div.1986) (noting that vehicle stop and search of defendant based solely on fact that defendant matched "drug courier profile" would be unconstitutional). A court must examine the totality of the circumstances, including the facts that may match profile characteristics, to determine whether reasonable suspicion exists. A "profile" characteristic is a relevant, objective characteristic when exhibited by a particular defendant. There is no reason why the police should not be able to consider that characteristic in formulating reasonable suspicion. There is also no reason why "profile" characteristics that are exhibited by a defendant cannot provide the basis for an investigative detention in the appropriate case.

In this case, the Appellate Division "conclude[d] that the [motion] judge could have reasonably determined that Officer Benoit and his colleagues relied on profiling data almost exclusively ... and not on reasonable individualized suspicion. This technique is not permissible." However, Detective Benoit never testified that he relied on a drug courier profile in formulating his suspicion of defendant. Instead, Benoit's testimony reveals that he relied on individual, objective characteristics actually exhibited by defendant.

The question is not one of drug courier profiling. The task before us is to determine whether the individual, objective charac-

teristics cited by Detective Benoit, in the aggregate, when considered in light of Detective Benoit's independent observations and law enforcement experience, constitute reasonable suspicion.

C

In determining whether reasonable suspicion exists, a court must consider "the totality of the circumstances—the whole picture." *Cortez, supra,* 449 *U.S.* at 417, 101 *S.Ct.* at 695, 66 *L.Ed.*2d at 629; *see also Davis, supra,* 104 *N.J.* at 504, 517 *A.*2d 859 (courts must "evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions"). "No mathematical formula exists for deciding whether the totality of circumstances provided the officer with an articulable or particularized suspicion that the individual in question was involved in criminal activity." *Davis, supra,* 104 *N.J.* at 505, 517 *A.*2d 859. As a result, a "reviewing court must decide if the officer's observations, in 'view of the officer's experience and knowledge, taken together with rational inferences drawn from those facts,' warrant a 'limited intrusion upon the individual's freedom.'" *Caldwell, supra,* 158 *N.J.* at 459, 730 *A.*2d 352 (quoting *Davis, supra,* 104 *N.J.* at 504, 517 *A.*2d 859). "[D]ue weight must be given ... to the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his [or her] experience." *Terry, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909. Against that backdrop, we consider the totality of the circumstances surrounding Detective Benoit's detention of defendant.

Detective Benoit testified that Agent Cahill informed him that two suspected drug traffickers were aboard American Airlines Flight 114 from Los Angeles to Newark. An airline ticket agent had alerted Agent Cahill. We acknowledge that that information standing alone does not support a finding of reasonable suspicion. However, we include the tip in the "totality of the

circumstances" analysis. In determining the reliability of a tip, a court must consider an informant's "veracity," "reliability," and "basis of knowledge." *Alabama v. White,* 496 *U.S.* 325, 328–29, 110 *S.Ct.* 2412, 2415, 110 *L.Ed.*2d 301, 308 (1990); *Caldwell, supra,* 158 *N.J.* at 460, 730 *A.*2d 352; *State v. Smith,* 155 *N.J.* 83, 93, 713 *A.*2d 1033, *cert. denied,* 525 *U.S.* 1033, 119 *S.Ct.* 576, 142 *L.Ed.*2d 480 (1998). When an informant is an ordinary citizen, New Jersey courts assume that the informant has sufficient veracity and require no further demonstration of reliability. *Davis, supra,* 104 *N.J.* at 506, 517 *A.*2d 859. Under the "basis of knowledge" prong, a court must consider whether "the information was obtained in a reliable way." *Smith, supra,* 155 *N.J.* at 94, 713 *A.*2d 1033. In making this determination, courts look to the tip itself, as "the nature and details revealed in the tip may imply that the informant's knowledge of the alleged criminal activity is derived from a trustworthy source." *Ibid.* "Basis of knowledge" can also be demonstrated where a tip "predict[s] hard-to-know *future* events." *Id.* at 95, 713 *A.*2d 1033. Such information implies that the informant is privy to the alleged criminal conduct. *Ibid.*

Here, the ticket agent was an "ordinary citizen" and thus veracity is assumed. The State, however, failed to establish the ticket agent's "basis of knowledge." The information provided by the ticket agent does not demonstrate that she had firsthand knowledge that defendant was carrying drugs. Yet, in the totality of circumstances analysis the ticket agent's firsthand observations are of some value. Further, although it does not appear that Agent Cahill possessed any independent information that the suspects were transporting narcotics, he would not have notified Detective Benoit unless he believed, based on the ticket agent's observations and his own experience and expertise in law enforcement, that the tip should be pursued.

The information relayed to Detective Benoit was not a "tip" in the traditional sense of the word. Nonetheless, both a layperson and a DEA agent had a suspicion, and it was not unreasonable for Detective Benoit to factor the suspicions that

were communicated to him into his own formulation of reasonable suspicion. The information imparted to Detective Benoit by the ticket agent and Agent Cahill was a building block leading to Benoit's conclusion that criminal activity was afoot. A police officer has the duty to investigate suspicious behavior. See *Davis, supra,* 104 *N.J.* at 503, 517 *A.*2d 859. If Benoit had ignored this information and failed to investigate suspicious behavior, he would have been derelict in his duty. See *State v. Gray,* 59 *N.J.* 563, 568, 285 *A.*2d 1 (1971) (stating that police forswear their duties if they do not investigate suspicious behavior); *State v. Dilley,* 49 *N.J.* 460, 468, 231 *A.*2d 353 (1967) (noting that investigation of suspicious circumstances "dictated by elemental police responsibilities"); *State v. Letts,* 254 *N.J.Super.* 390, 396, 603 *A.*2d 562 (Law Div.1992) (stating that police have duty to public to investigate behavior that suggests criminal activity). Detective Benoit had the right and the responsibility to incorporate that information into his judgment, as do we. Further, to ignore the tip would be to elevate form over function. We need not visit any new jurisprudential precincts to reach this result. We refer to the well-centered rule that

> [r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from *information that is less reliable than that required to show probable cause.*
>
> [*White, supra,* 496 *U.S.* at 330, 110 *S.Ct.* at 2416, 110 *L.Ed.*2d at 309 (emphasis added).]

 It is fundamental to a totality of the circumstances analysis of whether reasonable suspicion exists that courts may consider the experience and knowledge of law enforcement officers. *Maryland, supra,* 167 *N.J.* at 487, 771 *A.*2d 1220; *Citarella, supra,* 154 *N.J.* at 279, 712 *A.*2d 1096; *Arthur, supra,* 149 *N.J.* at 9–10, 691 *A.*2d 808; *Davis, supra,* 104 *N.J.* at 504, 517 *A.*2d 859. Detective Benoit had been a Port Authority police officer for some twenty-seven years. At the time of the suppression hearing, he had been "on loan" to the DEA for at least four years. During his DEA training, he learned common narcotics source cities, methods

of shipping and transporting narcotics, identifying characteristics of narcotics, and airlines frequently used by narcotics suppliers. His training also included working with different shippers and various police agencies throughout the country regarding narcotics shipments into Newark Airport. Over the past four years, Benoit has made over one hundred drug-related arrests. When asked whether he had ever acquired the type of information that he had received from Agent Cahill, he replied, "[n]umerous times, dozens of times." He also testified that he requests permission to search suspects' suitcases in the airport "every day. Hundreds of times." Accordingly, we give due weight to Detective Benoit's twenty-seven years of experience in the field of law enforcement and, most important, to his four years of experience in the field of narcotics interdiction.

Detective Benoit summed up that knowledge and experience in formulating his suspicions about defendant. For example, Benoit noted that defendant was traveling on a flight that departed from Los Angeles and arrived in Newark. In *Sokolow*, a DEA agent testified that, in his experience, the defendant's original destination, Miami, was a frequent destination for narcotics traffickers. *Supra*, 490 *U.S.* at 3, 109 *S.Ct.* at 1583, 104 *L.Ed.*2d at 8; *see also United States v. McCarthur*, 6 *F.*3d 1270, 1278 (7th Cir.1993) (finding defendant's train from major source city to be factor in reasonable suspicion analysis); *Martinson, supra*, 581 *N.W.*2d at 851 n. 3 (same). In *Sokolow*, the Supreme Court held that, although "a trip from Honolulu to Miami, standing alone, is not a cause for any sort of suspicion," when considered in light of other circumstances, a suspect's itinerary may be factored into the reasonable suspicion equation. *Supra*, 490 *U.S.* at 9, 109 *S.Ct.* at 1586, 104 *L.Ed.*2d at 11. In the present case, Detective Benoit testified that "[a] flight comes from Los Angeles, that particular flight we've arrested many people on. Drugs come up through Mexico, that stay in San Diego and Los Angeles, and [are] flown into Newark Airport through that route. That flight we had numerous arrests on."

Importantly, Detective Benoit also observed that both defendant and the other suspect had tickets that were purchased at the same time from the same agency, but they chose to travel separately and appeared not to know each other. In *United States v. Ushery,* 968 *F.*2d 575, 579 (6th Cir.), *cert. denied,* 506 *U.S.* 946, 113 *S.Ct.* 392, 121 *L.Ed.*2d 301 (1992), the court concluded that similar facts amply supported a finding of reasonable suspicion. In reviewing the totality of the circumstances, the court noted that the three suspects who were traveling together attempted to maintain the appearance of traveling separately. *Ibid.* Similarly, in *United States v. Forero–Rincon,* 626 *F.*2d 218, 222–23 (2d Cir.1980), the court held that two travelers from a "source" city who had identical shoulder bags, conversed and disembarked from the plane together, but separated when one whispered to the other, and then were rejoined, was a factor to be considered in the reasonable suspicion analysis.

Additionally, Detective Benoit confirmed Agent Cahill's description of defendant's ticket. The ticket was characterized as a "bulk" ticket purchased from a specific travel agency in California. According to Benoit, "bulk" tickets raise suspicion because "just based on experience … [,] based on watching people traffic narcotics, they're purchased like that a lot of times." He testified that narcotics suppliers prefer to buy a large number of tickets at once to save money and to avoid detection. The tickets are then distributed to individual couriers. Also, defendant's ticket was purchased from an agency known to Benoit as one frequently used by narcotics traffickers.

We recognize, as Benoit testified, that "law abiding citizens" purchase such tickets as well. However, the record reflects that the use of such tickets may on occasion be indicative of participation in the drug trafficking business. Detective Benoit examined defendant's ticket and, in combination with all of the other factors, concluded that the circumstances were suspicious. Although we do not give blind deference to that conclusion, we

accord it appropriate weight, particularly in light of Detective Benoit's extensive experience.

Additionally, just as Agent Cahill had described, both suspects were traveling with the same type of luggage—a small, black, "crew-type" bag with wheels and a handle. Both suspects carried their luggage onto the plane. Detective Benoit observed defendant disembark with such a bag. Benoit admitted that it is not unusual for travelers to use carry-on luggage, "but based on a totality of everything it raises your suspicions ... it makes me suspicious." In his experience, drug couriers often carry the same type of luggage that defendant carried, and often carry their bags onto the plane to limit outside access to the bag. Specifically, he testified that carry-on bags are "especially" prevalent among drug traffickers because "they don't want it in the belly of the aircraft, they don't want anybody on the ramp to have access to it. They are afraid of dogs at the tarmac checking bags."

Detective Benoit also confirmed that defendant's identification was an expired state identification card bearing the name "Roberta Chambers." Agent Cahill had informed Detective Benoit that the ticket agent alerted him that defendant checked in using "fraudulent identification." Benoit's notes recounting his conversation with Agent Cahill indicate that Cahill described "two women traveling with false ID." Benoit's police report describes the identification as "questionable." Detective Benoit later confirmed that the card bearing the name "Roberta Chambers" was indeed fraudulent when defendant identified herself as Felicia Stovall. Because Benoit's corroboration of the fraud occurred after the detention commenced, however, we do not consider that fact in determining whether reasonable suspicion existed prior to the detention.

The issue of the identification card is nonetheless relevant to our inquiry for two reasons. First, both the ticket agent and Agent Cahill found defendant's identification to be suspicious. Whether they characterized it as "fraudulent," as Benoit testified, "false," as Benoit wrote in his notes, or "questionable," as indicat-

ed in Benoit's police report, is of little consequence. That the ticket agent and Agent Cahill did not explain the bases for their suspicions is true. However, a ticket agent who examines identification on a regular basis found defendant's identification suspicious. DEA Agent Cahill conveyed the agent's concern, which he shared, that the identification was questionable—in effect, suspicious. Thus, Benoit had some suspicion based on that communication regarding defendant's identification even before he detained her.

Quite apart from that consideration, we now turn to Benoit's independent evaluation. In addition to Agent Cahill's characterizations of the identification card, Benoit found two facts unusual. Although most people carry "more substantial identification, specifically a driver's license," particularly those people traveling across country for an extended stay, defendant presented an identification card as her only form of identification. More important, the card had expired and listed an address on "Main Street" in Los Angeles. Accordingly, Detective Benoit found defendant's identification card suspicious based on the information he received from Agent Cahill and his own examination of the card.

During his encounter with defendant, Detective Benoit noticed that defendant appeared nervous and that her hand shook. Concededly, some individuals become nervous when questioned by a police officer. Nonetheless, the fact that such reactions may be commonplace does not detract from the well-established rule that a suspect's nervousness plays a role in determining whether reasonable suspicion exists. *See, e.g., Citarella, supra,* 154 *N.J.* at 280, 712 *A.*2d 1096 (holding that defendant's actions, including "acting nervously," amounted to reasonable suspicion); *Green, supra,* 346 *N.J.Super.* at 98, 787 *A.*2d 186 (listing excessive nervousness as factor in determining whether reasonable suspicion existed to justify stop in airport); *State v. Hickman,* 335 *N.J.Super.* 623, 637, 763 *A.*2d 330 (App.Div.2000) (finding defendant's unusual nervousness reasonable basis for officer's suspicion); *State v. Matthews,* 330 *N.J.Super.* 1, 5, 748 *A.*2d 1125 (App.Div.

2000) (finding defendant's nervousness among factors constituting reasonable suspicion); *see also Illinois v. Wardlow,* 528 *U.S.* 119, 124, 120 *S.Ct.* 673, 676, 145 *L.Ed.*2d 570, 576 (2000) ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *United States v. Cotton,* 261 *F.*3d 397, 409 (4th Cir.2001) (finding defendant's visible nervousness when approached by police and questioned factor providing reasonable suspicion); *United States v. Smith,* 201 *F.*3d 1317, 1323 (11th Cir.2000) (finding defendant's nervous appearance while waiting in bus terminal factor providing reasonable suspicion); *United States v. Maher,* 145 *F.*3d 907, 909 (7th Cir.1998) (finding defendant's overt nervousness as he approached patrol car factor providing police with reasonable suspicion); *United States v. Porter,* 107 *F.*3d 582, 584 (8th Cir.1997) (finding defendant's nervousness when questioned about his bags factor providing DEA agent with reasonable suspicion). Here, Benoit testified that "all the while [he] was talking to [defendant] and while [he] asked her for identification her hand shook," and she appeared "very nervous." In fact, Detective Benoit credibly testified that, as a result, his "suspicions were heightened after [he] spoke to [defendant]."

It may be, as the dissent points out, that no one of those factors alone constitutes reasonable suspicion. It also may be that some of those factors, such as the bulk ticket and the carry-on luggage, can be interpreted as being consistent with both innocence and guilt, and that some are simply neutral, occurring every day at airports. Even if all of the factors were susceptible of "purely innocent" explanations, a group of innocent circumstances in the aggregate can support a finding of reasonable suspicion. This Court has stated that

> [i]n evaluating the facts giving rise to the officer's suspicion of criminal activity, courts are to give weight to 'the officer's knowledge and experience' as well as 'rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise.' *The fact that purely innocent connotations can be ascribed to a person's actions does not mean that an officer cannot base a finding of reasonable suspicion on those actions* as long as 'a reasonable person would find the actions are consistent with guilt.'

[*Citarella, supra,* 154 *N.J.* at 279–80, 712 *A.*2d 1096 (quoting *Arthur, supra,* 149 *N.J.* at 10–11, 691 *A.*2d 808) (citations omitted) (emphasis added).]

Similarly, in *Arthur,* we noted that " '[i]t must be rare indeed that an officer observed behavior consistent only with guilt and incapable of innocent interpretation.' " *Arthur, supra,* 149 *N.J.* at 11, 691 *A.*2d 808 (quoting *United States v. Viegas,* 639 *F.*2d 42, 45 (1st Cir.), *cert. denied,* 451 *U.S.* 970, 101 *S.Ct.* 2046, 68 *L.Ed.*2d 348 (1981)).

*Citarella* and *Arthur* make clear that the police may rely on characteristics consistent with both innocence and guilt in formulating reasonable suspicion. Importantly, neither decision requires that the State present corroborating facts consistent only with guilt. As noted, such behavior is "rare indeed." *Ibid.* Both decisions focused on whether the totality of the circumstances, including factors consistent with both innocence and guilt, demonstrated reasonable suspicion to justify the stop. *Citarella, supra,* 154 *N.J.* at 281, 712 *A.*2d 1096; *Arthur, supra,* 149 *N.J.* at 11–12, 691 *A.*2d 808. Under our precedents, in determining whether reasonable suspicion is present in this case, we consider factors consistent with both innocence and guilt. The dissent concludes that Detective Benoit did not have reasonable suspicion to stop defendant because the factors relied on by Benoit, when viewed independently, are more consistent with innocence than guilt. *Post* at 383, 788 *A.*2d at 768. That analysis, however, ignores the mandate of the totality of the circumstances test, which requires us to view in the aggregate the facts known to Detective Benoit at the time of the stop.

In that regard, the case to be made for reasonable suspicion here is even more compelling because, unlike cases in which all of the factors are neutral yet amount to reasonable suspicion when aggregated, there are corroborating facts present here that are more consonant with guilt than with innocence. We thus hold that although some of the evidence in this record suggests benign behavior, the totality of all of the circumstances is more than sufficient to justify a finding of reasonable suspicion. As Benoit stated, even though no one factor would have "set off alarms" in

his head, when "coupled together [the] totality of it certainly makes you suspicious."

## IV

"Reasonable suspicion is 'a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *United States v. Valentine*, 232 *F.*3d 350, 353 (3d Cir.2000), *cert. denied*, 532 *U.S.* 1014, 121 *S.Ct.* 1748, 149 *L.Ed.*2d 670 (2001) (quoting *Wardlow, supra*, 528 *U.S.* at 123, 120 *S.Ct.* at 676–77, 145 *L.Ed.*2d at 576). As the case law suggests, the test is qualitative, not quantitative. Common sense, rather than a "neat set of legal rules," guides our analysis. *Gates, supra*, 462 *U.S.* at 232, 103 *S.Ct.* at 2329, 76 *L.Ed.*2d at 544.

We thus calibrate the scales, mindful always of the protections of the federal and state constitutions. We conclude that Detective Benoit had reasonable suspicion to stop defendant based on the following circumstances: the information relayed from the ticket agent and Agent Cahill to Detective Benoit; Benoit's confirmation of that information; Agent Cahill's description of defendant's identification as "fraudulent"; Benoit's independent determination that the identification was questionable because defendant's only form of identification was an expired identification card listing an address on Main Street in Los Angeles; defendant's flight originating in Los Angeles and arriving in Newark—a known drug trafficking route; defendant's ticket being purchased at the same time and from the same agency as the other suspect's ticket, but the two women traveling separately and appearing not to know one another; the "bulk" ticket; defendant's ticket being purchased from a travel agency frequently used by narcotics traffickers; defendant's small, carry-on "crew-type" bag; defendant's visible nervousness; and Detective Benoit's extensive experience and expertise in the narcotics interdiction field.

We take the facts as we find them; they cannot be neatly packaged. One can either patch together those factors into a quilt

of reasonable suspicion or parse those same factors to unravel the evidence of guilt. The better view, based on this evidence and the template of common sense, is that Detective Benoit had more than a "hunch." He had the responsibility not to turn a blind eye to what he heard and saw; he had the concomitant right to act as he did. Based on the totality of the circumstances, we are satisfied that Detective Benoit had reasonable suspicion to detain defendant.

Reversed.

COLEMAN, J., concurring in part and dissenting in part.

I agree with the majority that Detective Benoit's detention of defendant constituted a seizure. *Ante* at 358, 788 *A.*2d at 753. That seizure was part of an investigatory stop that "permits law enforcement officers to detain an individual temporarily for questioning." *State v. Maryland,* 167 *N.J.* 471, 486, 771 *A.*2d 1220 (2001). "[A]n investigatory stop directly implicates the Fourth Amendment because it involves a seizure in the constitutional sense." *Ibid.* Although the Fourth Amendment warrant and probable cause requirements are relaxed for an investigatory stop, such a seizure is constitutional only if, under the totality of circumstances, "there is a reasonable and particularized suspicion to believe that an individual has just engaged in, or is about to engage in, criminal activity." *Id.* at 487, 771 *A.*2d 1220; *State v. Davis,* 104 *N.J.* 490, 504, 517 *A.*2d 859 (1986). I disagree with the Court's holding that the record in this case, inclusive of the alleged drug courier profile information, establishes the constitutionally required reasonable and particularized suspicion that defendant possessed illegal drugs. Hence, I dissent.

I.

The starting point for evaluating the reasonableness of police conduct is the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution. Those provisions protect citizens against unreasonable police

searches and seizures by requiring warrants issued on probable cause unless the search or seizure falls within one of the "few specifically established and well-delineated exceptions" to the warrant requirement. *Schneckloth v. Bustamonte*, 412 *U.S.* 218, 219, 93 *S.Ct.* 2041, 2043, 36 *L.Ed.*2d 854, 858 (1973); *State v. Maryland, supra*, 167 *N.J.* at 482, 771 *A.*2d 1220; *State v. Citarella*, 154 *N.J.* 272, 278, 712 *A.*2d 1096 (1998); *State v. Hill*, 115 *N.J.* 169, 173–74, 557 *A.*2d 322 (1989). The exception to the warrant and probable cause requirements involved in this case is the investigatory stop, which permits law enforcement officers to detain an individual temporarily for questioning. *Terry v. Ohio*, 392 *U.S.* 1, 22, 88 *S.Ct.* 1868, 1880, 20 *L.Ed.*2d 889, 906 (1968); *State v. Davis, supra*, 104 *N.J.* at 504, 517 *A.*2d 859.

Under a Fourth Amendment analysis, the reasonableness of the police action in conducting an investigatory stop generally can be assessed by " 'balancing the need to search (or seize) against the invasion which the search (or seizure) entails.' " *Terry, supra*, 392 *U.S.* at 21, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905 (quoting *Camara v. Municipal Court*, 387 *U.S.* 523, 534–35, 536–37, 87 *S.Ct.* 1727, 1735, 18 *L.Ed.*2d 930, 940 (1967)); *State v. Arthur*, 149 *N.J.* 1, 7–8, 691 *A.*2d 808 (1997). The facts used in that balancing test are to be judged objectively: "would the facts available to the officer at the moment of the seizure or the search [justify] a man of reasonable caution in the belief that the action taken was appropriate?" *Terry, supra*, 392 *U.S.* at 21–22, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906 (internal quotations omitted). Thus, when determining whether Detective Benoit's and the other officers' actions were reasonable, consideration must be given "to the specific reasonable inferences which [they were] entitled to draw from the facts in light of [their] experience." *Id.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909; *State v. Arthur, supra*, 149 *N.J.* at 7–8, 691 *A.*2d 808. "Neither 'inarticulate hunches' nor an arresting officer's subjective good faith can justify an infringement of a citizen's constitutionally guaranteed rights." *State v. Arthur, supra*, 149 *N.J.* at 7–8, 691 *A.*2d 808. "Rather, the officer 'must be able to point to specific and articulable facts which, taken together with

rational inferences from those facts, reasonably warrant [the] intrusion.'" *Id.* at 8, 691 *A.*2d 808 (quoting *Terry, supra,* 392 *U.S.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906).

The level of reasonable suspicion necessary to justify an investigatory stop is "'something less than the probable cause standard needed to support an arrest.'" *State v. Arthur, supra,* 149 *N.J.* at 8, 691 *A.*2d 808 (quoting *State v. Thomas,* 110 *N.J.* 673, 678, 542 *A.*2d 912 (1988)); *see United States v. Sokolow,* 490 *U.S.* 1, 16, 109 *S.Ct.* 1581, 1590, 104 *L.Ed.*2d 1, 16 (1989). That is, there must be "some objective manifestation that the suspect was or is involved in criminal activity." *State v. Thomas, supra,* 110 *N.J.* at 678, 542 *A.*2d 912; *State v. Arthur, supra,* 149 *N.J.* at 8, 691 *A.*2d 808.

A.

I concur, with some reluctance, in the Court's decision to consider the drug courier profile information when deciding whether the standard controlling investigatory stops has been met. The Court's approval of consideration of the drug courier profile information as a factor to be considered when evaluating the totality of the circumstances to determine whether the articulable and particularized suspicion standard has been met, does not, however, alter the Court's obligation to make sure that an investigatory stop is based on the appropriate legal standard. *State v. Davis, supra,* 104 *N.J.* at 504, 517 *A.*2d 859; *State v. Patterson,* 270 *N.J.Super.* 550, 559–60, 637 *A.*2d 593 (Law Div.1993), *aff'd o.b.,* 270 *N.J.Super.* 562, 637 *A.*2d 599 (App.Div.1994). *See also State v. Costa,* 327 *N.J.Super.* 22, 32, 742 *A.*2d 599 (App.Div.1999) (holding that detention was not supported by reasonable articulable suspicion where only indication of criminal activity was the manner in which defendant and companion exited car); *State v. Contreras,* 326 *N.J.Super.* 528, 541, 742 *A.*2d 154 (App.Div.1999) (finding no reasonable, articulable suspicion of criminal activity to conduct stop of two defendants who "[paid] special attention" to police officers while in the train station and acted relieved once aboard the train by "looking up at the ceiling"); *State v. Egan,* 325

*N.J.Super.* 402, 408, 739 *A.*2d 469 (Law Div.1999) (holding that moving one's vehicle from one side of street to another was innocuous conduct that did not rise to level of the reasonable articulable suspicion needed to seize defendant and ask for his driving credentials); *State ex rel. J.G.,* 320 *N.J.Super.* 21, 33, 726 *A.*2d 948 (App.Div.1999) (finding no reasonable or articulable suspicion because police officer's "hunch to detain the travelers was based on a drug courier profile and not upon the specific overt conduct" of the juvenile and his adult traveling companion).

The Sixth Circuit has held that the fact that a defendant fits the drug courier profile is not a relevant factor in this calculus. *United States v. Lewis,* 556 *F.*2d 385, 389 (6th Cir.1977), *cert. denied sub nom., Van Lewis v. United States,* 434 *U.S.* 1011, 98 *S.Ct.* 722, 54 *L.Ed.*2d 754 (1978). Rather, a court should consider the facts exhibited by the defendant that are included in the profile and those that are not, and ask "what collectively do the facts show?" *Ibid. See also United States v. Berry,* 670 *F.*2d 583, 601 (5th Cir.1982) (noting characteristic exhibited by defendant that also is part of a drug courier profile does not necessarily preclude its use in formulating reasonable suspicion for stop, but "that we will assign no characteristic greater or lesser weight merely because the characteristic happens to be present on, or absent from, the profile"). But whenever the drug courier profile information is used in formulating the requisite level of suspicion, great care must be taken to avoid the trap Justice Marshall eloquently described. He recognized a potential for inconsistency in

the profile's "chameleon-like way of adapting to any particular set of observations." [*United States v. Sokolow,* 831 *F.*2d 1413, 1418 (9th Cir.1987), *rev'd,* 490 *U.S.* 1, 109 *S.Ct.* 1581, 104 *L.Ed.*2d 1]. *Compare, e.g., United States v. Moore,* 675 *F.*2d 802, 803 (6th Cir.1982) (suspect was first to deplane), *cert. denied,* 460 *U.S.* 1068, 103 *S.Ct.* 1521, 75 *L.Ed.*2d 945 (1983), *with United States v. Mendenhall,* 446 *U.S.* 544, 564, 100 *S.Ct.* 1870, 1882, 64 *L.Ed.*2d 497 (1980) (last to deplane), *with United States v. Buenaventura–Ariza,* 615 *F.*2d 29, 31 (2d Cir.1980) (deplaned from middle); *United States v. Sullivan,* 625 *F.*2d 9, 12 (4th Cir.1980) (one-way tickets), *with United States v. Craemer,* 555 *F.*2d 594, 595 (6th Cir.1977) (round-trip tickets), *with United States v. McCaleb,* 552 *F.*2d 717, 720 (6th Cir.1977) (nonstop flight), *with United States v. Sokolow,* 808 *F.*2d 1366, 1370 (9th Cir.), *vacated,* 831 *F.*2d 1413

(1987) (case below) (changed planes); [*United States v.] Craemer*, [555 *F*.2d 594, 595 (6th Cir.1977) ] (no luggage), *with United States v. Sanford*, 658 *F*.2d 342, 343 (5th Cir.1981) (gym bag), *cert. denied*, 455 *U.S.* 991, 102 *S.Ct.* 1618, 71 *L.Ed*.2d 852 (1982), *with* [*United States v.] Sullivan*, [625 *F*.2d 9, 12 (4th Cir.1980) ] (new suitcases); *United States v. Smith*, 574 *F*.2d 882, 883 (6th Cir.1978) (traveling alone), *with United States v. Fry*, 622 *F*.2d 1218, 1219 (5th Cir.1980) (traveling with companion); *United States v. Andrews*, 600 *F*.2d 563, 566 (6th Cir.1979) (acted nervously), *cert. denied sub nom., Brooks v. United States*, 444 *U.S.* 878, 100 *S.Ct.* 166, 62 *L.Ed*.2d 108 (1979), *with United States v. Himmelwright*, 551 *F*.2d 991, 992 (5th Cir.) (acted too calmly), *cert. denied*, 434 *U.S.* 902, 98 *S.Ct.* 298, 54 *L.Ed*.2d 189 (1977).

[*United States v. Sokolow, supra,* 490 *U.S.* at 13–14, 109 *S.Ct.* at 1588–89, 104 *L.Ed*.2d at 14 (Marshall, J., dissenting).]

I am also skeptical of law enforcement officials' reliance upon a suspected drug courier's city of origin or destination in establishing reasonable suspicion to conduct an investigatory stop because that factor also has yielded inconsistent results. If and when used, it should be given very little weight, if any, in evaluating whether reasonable suspicion exists. Travelers have raised suspicions based on such a wide host of "source cities" that this factor could implicate virtually any individual traveling to or from any American city. *E.g., Reid v. Georgia,* 448 *U.S.* 438, 441, 100 *S.Ct.* 2752, 2754, 65 *L.Ed*.2d 890, 894 (1980) (referring to appellate court's observation that Fort Lauderdale is a principal place of origin for cocaine); *United States v. $22,474.00 in U.S. Currency,* 246 *F*.3d 1212, 1216 (9th Cir.2001) (recognizing Phoenix as drug source city); *United States v. O'Neal,* 17 *F*.3d 239, 240 (8th Cir.), *cert. denied,* 513 *U.S.* 960, 115 *S.Ct.* 418, 130 *L.Ed*.2d 333 (1994) (recognizing Chicago as drug source city); *United States v. Ushery,* 968 *F*.2d 575, 579 (6th Cir.1992), *cert. denied,* 506 *U.S.* 946, 113 *S.Ct.* 392, 121 *L.Ed*.2d 301 (1992) (recognizing San Francisco as drug source city); *United States v. Forero–Rincon,* 626 *F*.2d 218, 220 (2d Cir.1980) (recognizing Miami as drug source city); *Johnson v. State,* 765 *A*.2d 926, 929 (Del.2000) (recognizing New York as drug source city). *State v. Green,* 346 *N.J.Super.* 87, 91, 787 *A*.2d 186 (App.Div.2001) (recognizing Jamaica as drug source country). "[T]housands of innocent persons travel from 'source cities' every day and … nearly every major city in the country may be characterized as a source or distribution city." *United*

*States v. Sokolow, supra,* 490 *U.S.* at 16, 109 *S.Ct.* at 1590, 104 *L.Ed.*2d at 16 (Marshall, J., dissenting).

Given the inauspicious inconsistencies in the drug courier profile and its "chameleon-like" characteristics, *United States v. Sokolow, supra,* 490 *U.S.* at 13, 109 *S.Ct.* at 1588, 104 *L.Ed.*2d at 14 (Marshall, J., dissenting), I believe courts engaged in an investigatory stop analysis should assign little weight to the shifting drug courier profile characteristics. Where a majority or any substantial number of people share a specific characteristic, that characteristic is of little or no probative value in such a particularized and context-specific analysis. *United States v. Montero–Camargo,* 208 *F.*3d 1122, 1131 (9th Cir.), *cert. denied sub nom., Sanchez–Guillen v. United States,* 531 *U.S.* 889, 121 *S.Ct.* 211, 148 *L.Ed.*2d 148 (2000). Such traits are frequently as consistent with innocence as they are with guilt.

This is not a case like *State v. Citarella, supra,* 154 *N.J.* at 280, 712 *A.*2d 1096, in which Detective Benoit recognized defendant from prior encounters or relied on specific facts from earlier encounters with defendant. Unlike the facts in *Reid, supra,* 448 *U.S.* at 439, 441, 100 *S.Ct.* at 2753–54, 65 *L.Ed.*2d at 894, and *State v. Citarella, supra,* 154 *N.J.* at 276, 712 *A.*2d 1096, defendant did not attempt to flee once Detective Benoit identified himself as a police officer. Also, unlike *State v. Arthur, supra,* 149 *N.J.* at 10, 691 *A.*2d 808, Detective Benoit did not observe a drug transaction or furtive movements. Rather, this is a case in which unverified, non-specific, unreasonable, and generalized characteristics were given significant weight and used as the basis to stop defendant. *Cf. State v. Kuhn,* 213 *N.J.Super.* 275, 280–81, 517 *A.*2d 162 (App.Div.1986) (noting some circumstances in which courts have found a sufficiently articulable basis to conduct a brief stop, including traffic violations, observations of narcotics or weapons, packages, objects or money changing hands between suspects, recent reports of a nearby crime, physical appearance or clothing suggestive of crime, the nearby presence of potential or likely

crime victims, and tips that a crime or drug transaction is about to occur).

B.

Based on the foregoing legal principles, I must ask what collectively do the facts show? My answer, unlike the majority, is that under the totality of the circumstances, there was no objective manifestation that defendant was involved in any criminal activity. The majority, I submit, has reached the wrong result by affording greater weight than is warranted to the reliability of the tip that spurred Detective Benoit into action. The record suggests that only a ticketing agent provided the initial non-criminal information to Agent Cahill. I agree with the majority that the information received from the airline representative standing alone, "does not support a finding of reasonable suspicion." *Ante* at 361, 788 *A*.2d at 755.

The origin of defendant's flight, the fact that her ticket had been purchased from an agency often used by drug couriers, that the ticket was of a type frequently used by drug couriers, and defendant's use of a crew-type bag with wheels that is pulled by a handle, are facts that are entirely consistent with innocent behavior. Detective Benoit acknowledged in his testimony that bulk tickets, such as the ticket used by defendant, are not illegal. *Ante* at 365, 788 *A*.2d at 757. Although his experience reveals that some passengers using bulk tickets have later been found to carry contraband, he acknowledged that they are legal and that law-abiding citizens also use them. Nor was there any empirical data presented to demonstrate that criminals use bulk tickets more often than law-abiding citizens. The same rationale applies to the travel agency. The fact that the travel agency is a legally operated business offering its services to law-abiding individuals who purchase bulk tickets from International Mirmar Travel, just as drug couriers might have, does not establish the required individualized suspicion.

Detective Benoit testified that Agent Cahill stated that defendant was using "fraudulent" or "fake" identification; however, in his official police report, he recorded that the identification was "questionable." Indeed, the only fact on the face of the state-issued identification card that could possibly be interpreted as "fraudulent" or "questionable" was that the expiration date had passed. It is uncontroverted that Detective Benoit subsequently discovered that Roberta Chambers, the name that was on the identification card, was not defendant's real name. However, there is nothing in the record to indicate that either the airline representative or Agent Cahill had independently discovered or confirmed that fact *before* defendant was stopped. Similarly, there is no proof that the card's Main Street address was known to have been fictitious, or that defendant did not actually live at that address, *before* she was stopped. "Facts learned by the authorities after the search and seizure occurs will not validate unreasonable intrusions." *State v. Bruzzese*, 94 *N.J.* 210, 221, 463 *A.*2d 320 (1983), *cert. denied*, 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984). Thus, I fail to see how having a recently expired identification card is remotely suggestive of criminality.

The majority mistakenly accords significance to the fact that the women boarded the plane in Los Angeles without appearing to know each other when the record does not establish any probability that they were acquainted. For example, in *Reid v. Georgia*, 448 *U.S.* 438, 439, 100 *S.Ct.* 2752, 2753, 65 *L.Ed.*2d 890 (1980), the defendant left a plane and proceeded through the terminal, occasionally looking backward in the direction of another man. When they reached the main lobby of the terminal, the second man caught up with the defendant and spoke briefly to him, before the two left together. *Ibid.* The United States Supreme Court held that the DEA agent who subsequently stopped the defendant could not reasonably have suspected the defendant of criminal activity on the basis of those observed circumstances. *Id.* at 441, 100 *S.Ct.* at 2754.

Even in the cases noted by the majority, law enforcement officials actually observed the suspects' efforts to avoid appearing as though they knew each other. In *United States v. Ushery*, 968 *F*.2d 575, 577–78 (6th Cir.), *cert. denied*, 506 *U.S.* 946, 113 *S.Ct.* 392, 121 *L.Ed.*2d 301 (1992), law enforcement officials actually observed the three suspected drug couriers not approaching one another, but making eye contact and nodding to one another prior to their flight. Upon their arrival in Cincinnati, other officials observed them as they rendezvoused and waited for a taxi cab together. *Ibid.* In *United States v. Forero–Rincon*, 626 *F*.2d 218, 220–21 (2d Cir.1980), an officer actually observed the suspects initially walking together, but after a whispered conversation, the two separated, briskly walked in single file as they approached a security checkpoint, scanned the area in a full circle, and ultimately met up again when they exited the terminal.

Unlike *Reid, Ushery*, and *Forero–Rincon*, where the suspects were observed trying to conceal that they were traveling together, the record in the present case does not show when defendant and the other passenger were observed allegedly trying to conceal that they knew each other or how they attempted to do so. Again, this was information provided by the airline representative, and Detective Benoit did not testify about any behavior that he actually observed to support any concealment. The women apparently boarded the airplane in Los Angeles in this fashion and disembarked similarly. If the women boarded acting as though they knew each other, and then left the plane in Newark acting as though they did not, perhaps that would have been a fact to consider in the totality of the circumstances. In this case, the State's assertion that the two were attempting to conceal the fact that they were traveling together is "simply too slender a reed to support the seizure" of defendant. *Reid, supra*, 448 *U.S.* at 441, 100 *S.Ct.* at 2754.

Detective Benoit also testified that defendant's use of a small black tote bag on wheels was suspicious. That is, drug couriers prefer to carry their luggage because "check in" luggage might

alert K–9 units. *Ante* at 353, 366, 788 *A*.2d at 750, 758. Yet, defendant's choice to carry her bag aboard the plane is hardly a fact suggestive that such persons are drug couriers. The proposition that it is unusual for airline passengers to choose to carry their bags, rather than check them, is not supported by any credible evidence presented in this case. Although drug couriers may have been apprehended while transporting drugs in carry-on luggage, thousands of other travelers transport perfectly legal items in tote bags with wheels pulled by handles, such as the crew-type bag in this case. *E.g., United States v. Glover*, 957 *F*.2d 1004, 1017 (2d Cir.1992) (Oakes, C.J., dissenting) (stating "[I]t is absurd, at least to anyone who has ever traveled on a bus, or an airplane for that matter, to suggest that there is something suspicious about not checking one's luggage in the under-bus compartment where it can be damaged or otherwise batted about.").

The only outward, visible sign that may have given Detective Benoit the slightest reason to suspect that defendant may have been involved in criminal activity was the fact that her hand shook as though she was nervous. When viewed in its proper context, that too, was not suggestive of criminality. The nervous hand movements occurred after Detective Benoit approached defendant and began asking her questions. The post-questioning nervousness, standing alone, does not come close to suggesting reasonable suspicion of criminality. ·

Although "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion[,]" *Illinois v. Wardlow*, 528 *U.S.* 119, 124, 120 *S.Ct.* 673, 676, 145 *L.Ed.*2d 570, 576 (2000), it is not uncommon for people to appear nervous or excited when a police officer is approaching. *State v. Lund*, 119 *N.J.* 35, 47, 573 *A.*2d 1376 (1990). It is settled that mere nervous and furtive gestures are insufficient, standing alone, to rise to the level of an articulable suspicion. *Ibid.; State v. Patterson, supra*, 270 *N.J.Super.* at 561, 637 *A.*2d 593. "Nervousness may mean something when combined with the discovery of drugs," but nervous movements alone do not

necessarily suggest criminal activity. *State v. Lund, supra,* 119 *N.J.* at 48, 573 *A.*2d 1376. Rather, they are displayed merely because the presence of police officers "tends to make most people somewhat apprehensive." *Ibid.* (citing *State v. Palacio,* 111 *N.J.* 543, 558, 545 *A.*2d 764 (1988) (Stein, J., dissenting)). *See also United States v. Andrews, supra,* 600 *F.*2d at 566 (noting that nervousness may, in fact, be "entirely consistent with innocent behavior, especially at an airport where a traveler may be antici-pating a long-awaited rendezvous with friends or family."); *State v. Costa, supra,* 327 *N.J.Super.* at 32, 742 *A.*2d 599 (stating a *Terry* stop "must be supported by more than just an awkward reaction to police presence.")

The only reasonable conclusion to be drawn is that defendant's nervousness was a normal reaction to police presence and ques-tioning of her. Her nervousness, manifested only by her shaking hand, was observed only after Detective Benoit stopped her and asked for identification. The detective told defendant that he was part of the narcotics interdiction unit and that she was a suspected drug courier. Any individual confronted with such an accusatory statement would likely react similarly. Further, Detective Be-noit's testimony demonstrates that defendant did not display any furtive movements or attempt to evade his questions. Rather, she answered all of his inquiries, told him where her flight had originated, produced her airline ticket and personal identification immediately upon request, and provided details about her plans while in the New Jersey–New York area. In fact, even after defendant initially invoked her right to refuse to allow Detective Benoit to look into her bags, she remained and waited while he called for the K–9 Unit, rather than attempting to flee. *Cf. State v. Citarella, supra,* 154 *N.J.* at 281, 712 *A.*2d 1096 (finding defendant's flight from police "heightened the level of reasonable articulable suspicion already engendered by" the defendant's ac-tions). Nothing in the record characterizes defendant as an evasive or furtive suspect.

My careful study of the evidence and reasonable inferences that can be drawn from that evidence leads me to conclude, as did the trial court and the· Appellate Division, that the State failed to establish the constitutionally required reasonable and particularized suspicion that defendant was involved in criminal activity.

## II.

My conclusion that the facts do not support the Court's holding that a reasonable and particularized suspicion existed to believe that defendant was an illegal drug courier is consistent with our past precedents. For example, in *State v. Maryland, supra,* 167 *N.J.* at 485, 771 *A.*2d 1220, the Court found that an investigatory stop predicated solely on race failed to satisfy the objective reasonableness standard. The police did not articulate a reasonable and particularized suspicion of criminal activity to support the investigatory stop of a defendant in a Rahway train station. *Id.* at 488, 771 *A.*2d 1220. Transit officers on graffiti patrol, not narcotics surveillance duty, observed the defendant getting off a train carrying a paper bag which he placed in the waistband of his sweat pants. *Ibid.* The police described that act as "unusual," leaping immediately to the conclusion that the paper bag might have contained drugs or a weapon. *Ibid.* We found that the record did not support a reasonable suspicion that the object was likely to be contraband. *Ibid.* No basis existed in the record respecting the officers' training or experience that justifiably could transform their hunch into the legal standard of a reasonable or articulable suspicion. *Ibid.*

In *State v. Citarella, supra,* 154 *N.J.* at 275, 281, 712 *A.*2d 1096, the Court found, under facts much more substantial than those in the present case, that a reasonable and particularized suspicion existed when the Fort Lee police stopped a suspect whom they had arrested on twenty-eight prior occasions. On that occasion, the defendant was observed riding a bicycle in a hurried fashion over the George Washington Bridge. *Id.* at 275, 712 *A.*2d 1096. The arresting officer had never seen the defendant with a bicycle

in his multiple encounters with the defendant but knew that the defendant generally drove an older model, four-door car, the defendant lived two miles from the area in the opposite direction in which he was riding, and the defendant's driving privileges had been suspended. *Id.* at 280, 712 *A.*2d 1096. After the officer identified himself, the defendant looked at him and then quickly pedaled away in an effort to elude the officer. *Id.* at 276, 712 *A.*2d 1096. Those facts, in conjunction with information relied on from past encounters with the defendant, provided a reasonable, articulable, and particularized suspicion that criminal activity was afoot. *Id.* at 276, 280, 712 *A.*2d 1096.

Under facts substantially different from those in the present case, the Court in *State v. Arthur, supra,* 149 *N.J.* at 7–8, 691 *A.*2d 808, found that the police had a reasonable and particularized suspicion to support an investigatory stop of a motor vehicle. The vehicle, with the defendant sitting in the driver's seat, was parked in a known area of high drug traffic that the police had under surveillance. *Id.* at 4, 691 *A.*2d 808. The police observed a person entering the vehicle on the passenger side and sitting for a few minutes next to the defendant. *Ibid.* The police then observed that person leaving the vehicle carrying a paper bag. *Ibid.* Based on their training and experience they believed that they had witnessed a narcotics transaction. *Id.* at 5, 691 *A.*2d 808. We were satisfied that, in view of the totality of circumstances, their belief was more than a mere hunch and rose to the level of reasonable and articulable suspicion. *Id.* at 12, 691 *A.*2d 808.

### III.

Based on the evidentiary record and the applicable legal principles, I conclude that collectively the facts do not demonstrate the existence of the required particularized suspicion that defendant had just engaged in, or was about to engage in, criminal activity. What occurred here was nothing more than Detective Benoit acting based on a lucky hunch engendered by generalized information. *State v. Patino,* 83 *N.J.* 1, 12, 414 *A.*2d 1327 (1980); *see also*

*State v. Maryland, supra,* 167 *N.J.* at 487, 488, 771 *A.*2d 1220 (emphasizing that officer's hunch, without more, cannot rise to level of reasonable and articulable suspicion in context of investigatory stop). "A search and seizure based on 'luck and hunch' is a 'combination of insufficient constitutional ingredients.' " *State v. Contreras, supra,* 326 *N.J.Super.* at 541, 742 *A.*2d 154 (quoting *State v. Patino, supra,* 83 *N.J.* at 12, 414 *A.*2d 1327).

I would, therefore, affirm the judgment of the Appellate Division and suppress the evidence.

Justice STEIN joins in this opinion.

*For reversal*—Chief Justice PORITZ and Justices LaVECCHIA and ZAZZALI—3.

*Concurring in part/Dissenting in part*—Justices STEIN and COLEMAN—2.