**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1110-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SHAEDDENZEL Y. COLEMAN,
a/k/a SHAED COLEMAN,

     Defendant-Appellant.

_____

Submitted March 14, 2018 – Decided May 8, 2019

Before Judges Fuentes and Koblitz.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 15-05-0939.

Joseph E. Krakora, Public Defender, attorney for appellant (Stephen W. Kirsch, Assistant Deputy Public Defender, on the brief).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Mary R. Juliano, Assistant Prosecutor, of counsel and on the brief; Emily M. M. Pirro, Legal Assistant, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

A Monmouth County grand jury indicted defendant Shaeddenzel Coleman on one count of second degree unlawful possession of a loaded nine millimeter Smith & Wesson handgun, N.J.S.A. 2C:39-5(b) and one count of fourth degree possession of a prohibited weapon, N.J.S.A. 2C:39-3(j). The police found and seized this firearm incident to a motor vehicle stop of defendant's car. After the court denied his motion to suppress the evidence seized, defendant pled guilty to second degree unlawful possession of a handgun. In exchange, the State agreed to dismiss the second count in the indictment and recommend the court sentence defendant to a term of five years imprisonment with forty-two months of parole ineligibility, as required by the Graves Act. N.J.S.A. 2C:43-6(c). The court sentenced defendant consistent with the plea agreement.

Pursuant to Rule 3:5-7(d), defendant appeals the court's denial of his motion to suppress arguing: (1) the motion judge erred in upholding the validity of the initial motor vehicle stop; and (2) the police officer did not have reasonable suspicion to request that defendant sign a consent form to search the car. After reviewing the record developed before the motion judge, we reject defendant's arguments and affirm. The State called only one witness at the N.J.R.E. 104 evidentiary hearing to adjudicate defendant's motion to suppress.

We derive the following facts from the record developed from the testimony of this witness.

I

At all times relevant to this case, Sergeant Lorenzo Pettway, then a patrol officer in the Asbury Park Police, was assigned to the Department - Street Crimes Unit (Street Crimes Unit), which he described as a

> small proactive unit set up in the police department to investigate individuals in Asbury Park engaging in narcotics, distribution, gang activity, shootings, homicide.
>
> . . . .
>
> Primarily we focus[ed] on just patrolling the high-crime areas throughout the city, initiating investigations, cultivating confidential informants to further our investigations, assist[ing] the Detective Bureau with their investigation[s].

On December 1, 2014, Pettway and his partner Officer Joseph Spanilla were assigned to surveil "the 10 block of Atkins Avenue" in an unmarked SUV. Pettway was wearing a t-shirt with "Police" across the front and a neck badge. He testified that he had made arrests in that area involving "[e]verything from narcotics possession, narcotics distribution, handgun possession . . . [to] other weapons [] related offenses" including a homicide. On that particular day, the police had received "a lot of complaints about a particular house . . . on Atkins

A-1110-16T1

Avenue." Pettway testified the house "was sort of a gang hangout spot, a lot of Crip gang members . . . claiming the area, were hanging out at that location." Pettway defined the phrase "claiming the area" as a property the gang had "tagged out . . . spraypainted [sic] graffiti on the side of the building, sidewalks, and they were selling drugs in that particular area."

At approximately 10:50 p.m., Pettway saw "a black Chevy" drive south at Atkins Avenue and stop in front of the suspected "Crip hangout" property. The vehicle had two occupants, a driver and a passenger seated in the front. The passenger stepped out of the car and started talking to the driver, who was subsequently identified as defendant. The car then pulled over to the curb on the right side of the road. As Pettway and Spanilla drove past defendant's car, defendant and the passenger "looked up at [Pettway] real quick and then they, the passenger, shut the door and walked into [the] Atkins [property] and the driver drove off from the area real quick."

Defendant's car was facing south when it pulled away from the curb. Pettway saw the car "move[d] left," onto Atkins Avenue. Atkins Avenue is a narrow two-way street that allows parking on both sides. Thus, if there are cars parked on both sides of the street, there is only room for one car to pass. At this point, Pettway turned the unmarked police SUV around "to initiate a traffic

4

stop." Pettway approached defendant's car and asked defendant for his driver's license, motor vehicle registration, and insurance card. Defendant produced an insurance card that reflected the insurance policy had expired. While defendant searched through the car to see if he had an active insurance card, Pettway asked him if he knew the person who had just gotten out of his car and entered the house at Atkins Avenue. According to Pettway, defendant "hesitated and said he didn't know his name." Based on defendant's inability to produce a valid insurance card, Pettway advised defendant that his car would be towed and asked him for permission to search the car.

Following what he dubbed a "formal process," Pettway read defendant "a Miranda[1] warning card," had defendant initial after each specific right described therein, and asked defendant to sign it. Pettway thereafter signed the Miranda document as a witness. Pettway next described how he obtained defendant's consent to search the car. He identified a "Consent to Search Form,"[2] which he "went over with Mr. Coleman." In response to a series of leading questions by the prosecutor, Pettway explained that the Consent to Search Form: (1)

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] Although the Miranda card and Consent to Search Form were authenticated and made part of the evidence the State presented to the motion judge at the suppression hearing, these documents were not provided to this court as part of the appellate record.

"indicates what's going to be searched"; (2) advises "there is a right to refuse to have the search conducted"; (3) contains "a line that says there's a right to revoke his consent at any time . . . [and that] the search may stopped at any time;" and "there's [a line indicating] a right to be present." Pettway testified that defendant signed the Consent to Search Form and Officer Spanilla signed as a witness.

Pettway testified he "accompanied" defendant back to his car to "stand by while I conducted a search of the vehicle." Pettway searched the interior of the car without incident. When he started to search the trunk, defendant "kind of asked if there's anything in the vehicle in the trunk would he be in trouble for it. And I explained if there was, he would be arrested, but I would give him an opportunity to give a statement." At this point, defendant asked Pettway to allow him to call his sister.

Pettway testified he stopped the search to permit defendant to make the call. Although Pettway was close enough to defendant to hear him speaking to someone with a "female voice," he could not "make out" the substance of the conversation. Pettway testified he heard defendant ask the female recipient if it was "okay to let the police search the trunk, [was] there anything in there . . . [?]" According to Pettway, defendant ended the call and told him to "go ahead and search the trunk." Pettway testified he found a loaded nine millimeter Smith

& Wesson handgun, "a single round [of] rifle ammunition . . . assorted [mail] that belonged to Mr. Coleman, some clothing as well as identification [that] belonged to Mr. Coleman." Pettway arrested defendant and transported him to the police station for processing.

At this point in Pettway's direct testimony, the prosecutor circled back to the initial motor vehicle stop to ask the following questions:

> Q. Going back to the original motor vehicle stop, could you please tell us why you conducted the motor vehicle stop?
>
> A. When Mr. Coleman pulled in, he failed to use the turn signal.
>
> Q. So it was for a motor vehicle violation?
>
> A. Yes, ma'am.
>
> Q. And then during the stop, could you please tell us why you asked for consent to search the car?
>
> A. It was a combination of when I initially rode by them they looked nervous, they looked at me, they abruptly stopped talking to one another, and the passenger walked in the house and Mr. Coleman quickly pulled away.
>
> Then when I was speaking to Mr. Coleman and asked him about his friend, what his friend's name was, he appeared nervous and said he didn't know his name, so at that point I thought there may be something in the car just based on that.

A-1110-16T1

Q. Was that also due to the location of these events?

A. Oh, yeah, oh, yeah. The location that the individual walked into the house is a known Crip house. It's the Crip safe house and we have had a lot of investigation at that location, around that area.

Pettway testified that after he arrested defendant for the unlawful possession of a handgun, he issued him a summons under Title 39 for operating an uninsured motor vehicle, failure to signal, and failure to wear a seatbelt. He also impounded defendant's car.

On cross-examination, Pettway admitted he did not know the name of the man he saw exit defendant's car and walk inside the alleged Crip safe house, nor whether this man had any affiliation to the Crips. Pettway did not know the names of any of the individuals who allegedly made complaints about the house on Atkins Avenue or when these complaints were made; none of the alleged complaints named defendant nor involved a car similar to the car defendant was driving that day. Pettway also did not see or detect any contraband or other indicia of illicit activity when he interacted with defendant immediately after or in the course of the motor stop. The following exchange describes defendant's activity prior to his arrest.

Q. You asked Mr. Coleman where he was coming from; is that right?

8

A. Yes.

Q. And he told you that he had come off from work?

A. Yes, ma'am.

Q. And that he dropped his friend off at his house?

A. Yes, ma'am.

Q. Anything about that suspicious to you, in and of itself?

A. No. In and of itself, no.

Q. Mr. Coleman was not able to produce an up-to-date insurance card, true?

A. That's correct, ma'am.

Q. And you made the decision to tow the car, right?

A. Yes, ma'am.

Q. And you also made the decision to search the car?

A. Yes, ma'am.

Q. It's not required to conduct a search before calling a tow truck, true?

A. That's correct, ma'am.

Pettway stopped defendant's car at approximately 10:50 p.m. The computer generated record of interactions with the dispatcher at the station is known under the acronym "CAD." Page seven of Pettway's police report of this

9

A-1110-16T1

incident indicates a CAD report timed 11:43 p.m. was generated documenting a transmission that a handgun had been found in defendant's car. Despite defendant's failure to produce a valid insurance card, the record shows Pettway did not call for a tow truck before he searched defendant's car. Finally, Pettway did not issue the Title 39 summons against defendant until he returned to the police station.

Based on this testimonial evidence, the motion judge found "the totality of the circumstances certainly gave reasonable suspicion that either the car had - - that there was evidence of a crime or a crime about to have been committed that would allow Officer Pettway to request permission to search." Citing State v. Tucker, 136 N.J. 158, 169 (1994), the motion judge found "the high crime and late evening hours" were factors that supported a "particularized suspicion or reasonable belief that the circumstances are consistent with criminal conduct."

In addition to the elements of time, the area's reputation for criminal activity, and the numerous complaints about the presence of a "gang safe house," the judge found it particularly germane that:

> once [Pettway] indicated that the car was going to be impounded [Pettway] gave the defendant the option of consenting to the search and as indicated, the defendant clearly understood the terms of the consent and asked that at some point during the search that it be stopped. The officer lawfully complied with that, allowed the

defendant to make a request by telephone and then the search continued.

II

Based on this record, defendant raises the following arguments:

THE MOTION TO SUPPRESS SHOULD HAVE BEEN GRANTED; CONTRARY TO THE MOTION JUDGE'S RULING, THE STATE DID NOT CARRY ITS BURDEN OF DEMONSTRATING THE VALIDITY OF: (A) THE MOTOR-VEHICLE STOP, BECAUSE THE OFFICER PROVIDED INSUFFICIENT TESTIMONY TO LEAD TO A CONCLUSION THAT A VIOLATION OF A MOTOR-VEHICLE LAW HAD TAKEN PLACE, AND (B) THE REQUEST FOR CONSENT TO SEARCH, BECAUSE IT WAS UNSUPPORTED BY REASONABLE SUSPICION THAT SUCH A REQUEST WOULD LEAD TO THE DISCOVERY OF CONTRABAND.

As an appellate court, we are bound to defer to the motion judge's factual findings "that are 'supported by sufficient credible evidence in the record.'" State v. Mohammed, 226 N.J. 71, 88 (2016) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). This deferential review is particularly appropriate in cases where, as here, the judge's findings are "substantially influenced by [an] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Gamble, 218 N.J. at 424-25 (citing State v. Johnson, 42 N.J. 146, 161 (1964)). However, the judge's legal conclusions

11

derived from these facts are reviewed de novo. State v. Nash, 212 N.J. 518, 541 (2013)

A traffic stop "must be based on reasonable and articulable suspicion that an offense, including a minor traffic offense, has been or is being committed." State v. Bacome, 228 N.J. 94, 103 (2017) (quoting State v. Carty, 170 N.J. 632, 639-40 (2002)). Reasonable suspicion means "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968). "Reasonable suspicion" is "less than proof . . . by a preponderance of evidence," and "less demanding than that for probable cause," but must be something greater "than an 'inchoate and unparticularized suspicion or hunch.'" United States v. Sokolow, 490 U.S. 1, 7 (1989). "To satisfy the articulable and reasonable suspicion standard, the State is not required to prove that the suspected motor-vehicle violation occurred." State v. Locurto, 157 N.J. 463, 470 (1999). Instead, "the State need prove only that the police lawfully stopped the car, not that it could convict the driver of the motor-vehicle offense." State v. Williamson, 138 N.J. 302, 304 (1994).

The State must show an officer had an objectively reasonable belief a traffic violation occurred. State v. Puzio, 379 N.J. Super. 378, 383 (App. Div.

2005). However, "the fact that information an officer considers is ultimately determined to be inaccurate . . . does not invalidate a seizure." State v. Pitcher, 379 N.J. Super. 308, 318 (App. Div. 2005).

N.J.S.A. 39:4-126 provides:

> No person shall . . . turn a vehicle from a direct course or move right or left upon a roadway, or start or back a vehicle unless and until such movement can be made with safety. No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided in the event <u>any other traffic may be affected by such movement</u>.

> [(Emphasis added).]

In Williamson, the Court explained that N.J.S.A. 39:1-126 "does not require that a signal be given whenever a lane change is made." 138 N.J. at 303. Instead, before moving right or left on a roadway, a motorist is required to signal a lane change if "other traffic may be affected by such movement." Id. at 303 (quoting N.J.S.A. 39:4-126). The Court focused on the language "may affect traffic" and explained that other traffic may be "fairly close and visible, and that the signal need not be dictated solely by concerns of safety and accident avoidance." Ibid. The Court reasoned that "[m]otorists in the vicinity whose movements may be affected must be made aware of a driver's intentions." Ibid. Therefore, "the officer ordering a stop must have some articulable basis for

13

concluding that the lane change might have an effect on traffic." Ibid. To prove a violation, the State need not show that the signal did in fact affect traffic, but only that it had "the potential of doing so." State v. Moss, 277 N.J. Super. 545, 547 (App. Div. 1994). "Other traffic" can include a police vehicle. Williamson, 138 N.J. at 304; Moss, 277 N.J. Super. at 547.

Defendant argues that Pettway did not explain how the movement of defendant's vehicle away from the curb may have affected other traffic. In response, the State emphasizes that Pettway provided a reasonable, articulable basis from which the motion judge found that the traffic stop was based, in part, on defendant's observable failure to signal in violation of N.J.S.A. 39:4-126. This conduct by defendant could have reasonably affected traffic. The State argues that State v. Heisler, 422 N.J. Super. 399 (App. Div. 2011) and State v. Jones, 326 N.J. Super. 234 (App. Div. 1999) highlight the facts necessary to show a reasonable and articulable suspicion of a failure to signal traffic violation.

In Heisler, the defendant, who was being followed by a police officer, was traveling towards an intersection, and pulled into a left-turn lane without signaling. 422 N.J. Super. at 407. The police officer testified that besides his vehicle, there was other traffic traveling in the vicinity, and explained "[o]ne

vehicle turned into a parking lot before reaching the intersection. Another vehicle [turned onto the same road] while defendant and [the police officer] waited at the light." Ibid. The court explained that the police officer had a reasonable and articulable suspicion that the defendant had violated a motor vehicle law by failing to signal because "the officer reasonably believed that defendant's actions may have affected other vehicles. Also, the evidence supported a reasonable and articulable suspicion that the failure to signal may have affected [the police officer's] own vehicle." Id. at 413.

In Jones, the court ultimately suppressed the evidence on other grounds. 326 N.J. Super. at 245. However, the defendant argued the state trooper did not have a reasonable and articulable suspicion of a motor vehicle violation because the State Trooper did not testify that other traffic had been affected by the defendant's failure to signal. Id. at 239. The State Trooper testified the traffic stop occurred during rush hour, and there were several other vehicles on the road when the defendant failed to signal. Ibid. The court determined "the rush hour traffic conditions were sufficient to support an articulable and reasonable basis for concluding that the unsignaled [sic] lane change might have an effect on other vehicles." Id. at 239.

Here, Pettway testified Atkins Avenue is a narrow, two-way street where cars are allowed to park on both sides of the road, and "sometimes . . . one direction of traffic going north might have to stop to allow the traffic going south." As he passed defendant's vehicle, Pettway testified he saw defendant pull away from the curb without signaling, and began to drive south down the road. The motion judge found that "[e]ven if there would be some defense as to whether or not there were enough vehicles around that would constitute a hazard," Pettway had a reasonable and articulable suspicion that a motor vehicle violation had occurred. There is no evidence or testimony from Pettway that other vehicles were traveling in the vicinity at the time of defendant's failure to signal. Instead, based on the record, the only vehicle that may have been affected by defendant's failure to signal was Pettway's unmarked police SUV.

According to Pettway, there were cars parked on both sides of the street, reducing even more Atkin Avenue's narrow traffic lanes. When defendant pulled out from the curb, two lanes of traffic would not be available to motorists traveling on the road at the same time. This would negatively affect the flow of traffic by creating a funnel effect for other cars trying to pass through. It is not clear from the record whether this situation was present when defendant failed to signal. However, under these circumstances, Pettway had a reasonable and

16

articulable suspicion that a motor-vehicle violation occurred under N.J.S.A. 39:4-126.

We thus discern no legal grounds to interfere with the motion judge's decision to deny defendant's motion to suppress the evidence found as a result of the traffic stop.

## III

We next address whether the motion judge properly rejected defendant's argument attacking the validity of Pettway's request to defendant to sign a consent form to search the car. Defendant argues the motion judge erred in upholding the validity of his consent because Pettway did not have a reasonable suspicion that the search would lead to the discovery of contraband. We begin our analysis by reaffirming certain bedrock principles of our State's search and seizure jurisprudence.

Warrantless searches and seizures are presumed invalid under the Fourth Amendment of the United States Constitution and Article I, Paragraph 7, of the New Jersey Constitution. State v. Pineiro, 181 N.J. 13, 19 (2004). The burden is on the State to prove that a warrantless search "falls within one of the few well-delineated exceptions to the warrant requirement." Ibid. (quoting State v. Maryland, 167 N.J. 471, 482 (2001)). A knowing, voluntary consent is a well-

recognized exception to the Fourth Amendment's search warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); State v. Coles, 218 N.J. 322, 337 (2014). The record must show the consent to search was freely and voluntarily given. Bustamonte, 412 U.S. at 248-49; State v. Sugar, 100 N.J. 214, 234 (1985) ("A valid consent to a search must be clear, knowing, voluntary, unequivocal, and express."). The person giving consent must know he or she has the right to refuse consent. State v. Johnson, 68 N.J. 349, 353-54 (1975).

Prior to seeking consent to search a motor vehicle, the requesting officer must have a reasonable and articulable suspicion that a search would reveal evidence of criminal wrongdoing. Carty, 170 N.J. at 635. That standard has been defined as "a particularized and objective basis for suspecting the person stopped of criminal activity[,]" and is a far lower standard than probable cause. State v. Stovall, 170 N.J. 346, 356-57 (2002) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). "A finding of reasonable and articulable suspicion of ongoing criminality" is determined by objective "cumulative factors in a totality of the circumstances analysis." State v. Elders, 192 N.J. 224, 250 (2007); see also Gamble, 218 N.J. at 413 ("The standard takes into account 'the totality of the circumstances — the whole picture.'"). Factors that have been found to give rise to a reasonable suspicion in the totality of the circumstances

include nervousness of the defendant, "additional evasive action, lying to the police, the presence of other incriminating information about the motorist or occupants of the car . . . even the lateness of the hour." Gamble, 218 N.J. at 430. Additionally, "a group of innocent circumstances in the aggregate can support a finding of reasonable suspicion." Stovall, 170 N.J. at 368.

Here, defendant argues Pettway lacked reasonable and articulable suspicion to request consent to search his car. In response, the State identifies seven separate factors that, when considered in the totality of the circumstances, established a reasonable and articulable basis for Pettway to suspect that a search of defendant's vehicle would reveal evidence of criminal wrongdoing. These factors are: (1) the late hour; (2) the location where the stop occurred was known to law enforcement as a high crime area that included the presence of a gang safe house; (3) the "evasive conduct" of the passenger leaving the car and entering the gang safe house immediately after Pettway drove by defendant's car; (4) defendant's immediate attempted departure in violation of the motor vehicle code; (5) defendant's nervous demeanor when approached by Pettway; (6) defendant's inability to identity the passenger; and (7) Pettway's training and experience as a police officer assigned to the Street Crimes Unit.

A-1110-16T1

Our Supreme Court has considered the "late hour of night" and an area's status as a "high crime area" as factors in a totality of the circumstances analysis. See Gamble, 218 N.J. at 430 (identifying the "lateness of the hour" and the location's status as a "high-crime" area as factors that, in the totality of the circumstances, can give rise to a reasonable and articulable suspicion of criminal activity); State v. Nishina, 175 N.J. 502, 512 (2003) (explaining that "[t]he time of day and physical location at which a police-citizen encounter takes place are relevant to the analysis"); State v. Butler, 278 N.J. Super. 93, 104-5 (1994) ("The lateness of the hour and high-crime status of an area are two important factors which can typically elevate an officer's suspicion.").

The Court has also concluded that a defendant's nervousness and suspicious behavior, considered in the context of other factors, may play a role in determining whether a police officer can establish a reasonable and articulable suspicion to request consent to search a defendant's vehicle. See State v. Mann, 203 N.J. 328, 339-40 (2010) (noting that a defendant's nervousness alone may not be sufficient to establish a reasonable and articulable suspicion, however, when coupled with other factors, may give rise to reasonable suspicion); Nishina, 175 N.J. at 512 (explaining that a defendant's "highly questionable, if not inherently unreliable" response to a question contributed to an officer's

20

reasonable suspicion); Stovall, 170 N.J. at 367 (noting that while "some individuals become nervous when questioned by a police officer . . . the fact that such reactions may be commonplace does not detract from the well-established rule that a suspect's nervousness plays a role in determining whether reasonable suspicion exists").

A court may also consider a police officer's training and past experiences in determining whether reasonable and articulable suspicion existed. See Stovall, 170 N.J. at 361 (considering a detective's independent observations and law enforcement experience); State v. Citarella, 154 N.J. 272, 279 (1997) (giving weight to "the officer's knowledge and experience" as well as "rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise").

Finally, a defendant's sudden departure from an area, when considered in the totality of the circumstances, can also contribute to an officer's reasonable suspicion. See Pineiro, 181 N.J. at 25-26 (explaining that "flight alone does not create reasonable suspicion . . . although in combination with other circumstances it may support reasonable and articulable suspicion"); Citarella, 154 N.J. at 281 (explaining that defendant's flight became an additional factor that heightened the level of reasonable and articulable suspicion).

Defendant argues the motion judge erred by finding it significant that defendant and his passenger attempted to leave the area when they noticed Pettway observing them, because "ordinary people in urban areas often do not wish to be in the presence of the police." We agree there is no rational basis to support this type of gross generalization. Indeed, it is per se improper to associate any form of stereotype behavior to a person merely based on where he or she resides. However, the record shows the motion judge's decision to deny defendant's motion was based on the totality of the circumstances, including the seven factors the State identified.

Defendant also argues the circumstances here are similar to those the Court reviewed in Elders, in which the defendant's nervousness and refusal to identify the passenger of his car did not give rise to an articulable and reasonable suspicion that contraband would be found in his vehicle. 192 N.J. at 246-51. We disagree.

In Elders, the Court found that the State Troopers lacked a reasonable and articulable suspicion to request consent to search a car, and instead relied on a "hunch" that "something was wrong." Elders, 192 N.J. at 250. The Troopers in Elders came upon two cars on the shoulder of the New Jersey Turnpike at approximately three o'clock in the morning. Id. at 232. Two of the defendants

22

were attempting to re-attach a gas tank to one of the cars, while two other defendants sat on the guardrails; two other defendants were asleep in another car; all of the defendants were from North Carolina. Ibid. The Troopers did not accept the defendants' explanation regarding the gas tank, and "surmised that perhaps drugs were being secreted in a compartment beneath the car." Ibid. When the Troopers asked them where they came from, the defendants gave conflicting stories naming different cities in New York, and appeared nervous. Id. at 233-35.

In concluding that the State did not show articulable suspicion, the Court highlighted the nervousness and conflicting statements of the defendants, and explained that "not all persons feel comfortable in the presence of the police" and that the out-of-state defendants may not be familiar with New York. Id. at 249. However, the Court also explained that "nervousness and conflicting statements, along with indicia of wrongdoing, can be cumulative factors in a totality of the circumstances analysis that leads to a finding of reasonable and articulable suspicion of ongoing criminality." Id. at 250.

Here, the totality of the circumstances, including but not limited to defendant's nervousness and refusal to identify his passenger, are factors that contributed to Pettway's reasonable and articulable suspicion that a search would

23

reveal evidence of criminal wrongdoing. Furthermore, "[t]he fact that purely innocent connotations can be ascribed to a person's actions does not mean that an officer cannot base a finding of reasonable suspicion on those actions as long as 'a reasonable person would find the actions are consistent with guilt.'" Citarella, 154 N.J. at 279 (quoting State v. Arthur, 149 N.J. 1, 10-11 (1997)). In Elders, the Troopers relied on the defendants' nervousness and inconsistent statements to support a "hunch." These were the only factors that the State relied on to argue the Troopers had a reasonable and articulable suspicion that a search of the defendants' cars would reveal evidence of criminal wrongdoing. Elders, 192 N.J. at 250.

Here, considering the totality of the circumstances, prior to seeking consent to search the vehicle, Pettway had a reasonable and articulable suspicion that a search of defendant's vehicle would reveal evidence of criminal wrongdoing. Although viewed in isolation, each of the factors highlighted by Pettway may be constitutionally insufficient to justify a consent to search, when viewed in the aggregate, the motion judge found they established a reasonable and articulable suspicion. We discern no legal or factual basis to disturb the judge's decision to deny defendant's motion to suppress.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1110-16T1