**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1513-21
       A-3877-21

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

MICHAEL A. GILLIARD,

  Defendant-Appellant.

_____

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

TYON E. EVANS, a/k/a
TYWON EVANS, and
PAC-MAN,

  Defendant-Appellant.

_____

    Argued September 18, 2023 (A-1513-21) and November
    13, 2023 (A-3877-21) – Decided February 9, 2024

    Before Judges Gilson and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 20-02-0237.

Scott Michael Welfel, Assistant Deputy Public Defender, argued the cause for appellant in A-1513-21 (Joseph E. Krakora, Public Defender, attorney; Ashley T. Brooks, Assistant Deputy Public Defender, and Scott Michael Welfel, of counsel and on the briefs).

Colin Sheehan, Assistant Deputy Public Defender, argued the cause for appellant in A-3877-21 (Joseph E. Krakora, Public Defender, attorney; Colin Sheehan, of counsel and on the brief).

William P. Cooper-Daub argued the cause for respondent in A-1513-21 (Matthew J. Platkin, Attorney General, attorney; Amanda Frankel, Deputy Attorney General, of counsel and on the brief).

David M. Galemba, Deputy Attorney General, argued the cause for respondent in A-3877-21 (Matthew J. Platkin, Attorney General, attorney; David M. Galemba, of counsel and on the brief).

PER CURIAM

These appeals, which we have consolidated for the purpose of issuing a single opinion, arise out of the search of a vehicle and the occupants and seizure of two handguns. Following the denial of a motion to suppress the handguns seized without a warrant, co-defendants Michael Gillard and Tyon Evans both pleaded guilty to second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:58-4, and were sentenced to five years in prison with forty-

two months of parole ineligibility as prescribed by the Graves Act, N.J.S.A. 2C:43-6(c). They now appeal from the orders denying their motion to suppress. Because the searches and seizures were unlawful, we reverse, vacate their convictions, and remand for further proceedings.

I.

A grand jury indicted Gilliard on two counts of second-degree unlawful possession of a weapon, N.J.S.A. 2C:58-4 and N.J.S.A. 2C:39-5(b), and one count of third-degree receiving stolen property, N.J.S.A. 2C:20-7(a). Gilliard was also charged with disorderly persons possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(4). The same grand jury indicted Evans on second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b), and third-degree receiving stolen property, N.J.S.A. 2C:20-7(a).

Gilliard and Evans moved to suppress the two handguns seized without a warrant after a BMW they had been riding in was stopped. The BMW had been driven by Kafir Anderson. We recite the relevant facts from the record developed at a multi-day evidentiary hearing on the motion to suppress. The State presented testimony from Asbury Park Police Officers Christopher Leahy and Samuel Griffeth, and Sergeant Frank Sangi. On December 1, 2019, Leahy was assigned to monitor the surveillance cameras in the city's "high-crime areas" for suspicious behavior. Around 1:00 a.m. on December 2, he "believed" there

was a radio call concerning gunshots heard around Washington Avenue. He viewed the video footage of two unidentified men approaching another man as he walked out of 1292 Washington Avenue.[1] As the man attempted to flee east on Washington Avenue, the two men fired multiple gunshots at the victim, one of which hit his arm.

The following night, Leahy monitored the 1200 block of Washington Avenue. While watching the surveillance camera, at around 10:00 p.m., he saw Gilliard engaged in what he thought was "suspicious behavior." Leahy knew Gilliard based on prior "field contacts." Gilliard briefly entered 1292 Washington Avenue, then came back out and walked west on Washington Avenue while "cupping" his left arm "very tightly to his body, almost as if he was gripping something." Leahy later testified he thought Gilliard was "holding something within his jacket or waistband area." Leahy then watched as Gilliard walked west on Washington Avenue out of the camera's view.

Thereafter, at 10:05 p.m., Leahy observed a silver BMW drive up and park in front of 1292 Washington Avenue. A male exited the BMW, briefly entered 1292 Washington Avenue, exited the building, and then entered the BMW through the rear driver's-side door. The BMW, which appeared to have a driver

---

[1] The surveillance camera video was played at the suppression hearing.

and two passengers, then pulled away from the parking space without signaling. Leahy testified the BMW then stopped in the middle of the street and Gilliard entered the rear passenger side.

Leahy radioed Griffeth, who was on patrol in a police vehicle, and told him the BMW "[left the] 1200 block of Washington Avenue without signaling properly out of the parking space." On cross-examination, Leahy identified Washington Avenue as a one-way street. He admitted that he ordered Griffeth stop the BMW and expected Griffeth to comply. Leahy's report confirmed that he had "transmitted over the radio to Officer Griffeth to conduct a traffic stop with this vehicle."

Griffeth testified he received information from Leahy that he was "conducting surveillance on the city cameras and he observed a couple of individuals involved in suspicious behavior." By radio, Leahy advised him the BMW was traveling south on Ridge Avenue towards Springwood Avenue. On cross-examination, Griffeth testified that Leahy did not order him to stop the BMW. However, Griffeth admitted that his report stated Leahy "advised [him] via police radio that he would like me to stop a vehicle, which he observed partaking in suspicious activity in front of 1292 Washington Avenue." Griffeth acknowledged that he intended to stop the BMW based on Leahy's direction.

5

Griffeth pulled his vehicle to the side of the road on Ridge Avenue and waited for the BMW. Shortly thereafter, Griffeth saw the BMW slow down as it approached a red light at the intersection of Ridge Avenue and Springwood Avenue. He then saw the BMW's turn signal activate as the car made a right-hand turn at the red light without coming to a full stop. Griffeth testified that he observed two motor vehicle infractions: (1) the failure to initiate the turn signal 100 feet prior to turning, and (2) the failure to come to a complete stop at the red light. Griffeth pulled his vehicle out onto the street, pursued the BMW, and conducted a motor vehicle stop. Griffeth did not check the BMW's license plate before exiting his vehicle.

Griffeth testified that as he approached the BMW, he did not see any of the occupants make furtive moments or "duck" under the seat. He also testified that he did not see any of the rear passengers leaning up. When Griffeth got to the driver's side of the BMW, he saw four occupants in the car. He knew all the occupants based on their gang affiliations but was unable to identify the specific gang.

Although Griffeth spoke to each occupant, his initial interaction was primarily with Anderson, the driver, through the open driver's window. Anderson produced his license, but explained to Griffeth that the BMW was his father's car, and he did not have the insurance card or the vehicle registration.

6

Anderson asked Griffeth to "look up" the license plate to check the registration. Griffeth did not check Anderson's driver's license or the registration.

Griffeth testified that he detected the odor of raw and burnt marijuana while standing by the driver's window. He saw the two rear passengers, Gilliard and a juvenile, smoking cigars. Griffeth asked the rear passengers if they were smoking a cigar to cover up the "weed." Gilliard stated, "no, no at all." Anderson admitted to smoking marijuana about fifteen minutes before the stop.

Sangi, as the road supervisor, arrived at the traffic stop to assist and walked to the passenger's side of the vehicle. He did not speak with Griffeth, so he did not know Anderson failed to produce the vehicle registration or insurance card.

After Sangi's arrival, Griffeth told the occupants the car would be searched for "weed." Griffeth removed Anderson from the BMW and searched him near the trunk but did not recover marijuana. Next, Griffeth removed the juvenile, the rear driver's side passenger, from the BMW. No marijuana was found during the search of the juvenile. He was then placed the juvenile near Anderson and later arrested him.

Griffeth conducted a search of Evans, the front seat passenger in the BMW, which revealed marijuana and a "large roll" of cash. Evans was placed in handcuffs. Five or six additional officers then arrived at the stop.

A-1513-21

Gilliard was removed from the car, and Sangi conducted a pat-down based on the "strong odor of raw marijuana" coming from him. Sangi discovered marijuana and a loaded gun during the search. Gilliard was placed under arrest.

After the occupants were placed under arrest, the officers searched the car. Sangi testified that he was "concerned" because the BMW "came from a location that just had a shooting prior to" the traffic stop. Like Griffeth, he did not see the occupants make any furtive movements or Evans move toward the glove compartment. Sangi further stated the officers had probable cause to search the remainder of the BMW based on the marijuana found on Evans. Additionally, Sangi explained he obtained the car keys from another officer and searched the glove compartment because Anderson "never provided the registration or insurance information." A loaded gun was discovered. Later, Sangi received "the owner's consent" to search the BMW.

In a July 30, 2021 oral decision, the trial court denied defendant's motion to suppress the handguns, finding each of the State's witnesses "credible" and their testimony "consistent" with the video of the stop and search. The court found Griffeth had an "objectively reasonable and articulable" basis to the stop the BMW—the failure to stop at the turn and the failure to properly use a turn signal—and there was no requirement that Griffeth issue citations. In addition, the court reasoned the motor vehicle infractions were "independent intervening

8

events, sufficiently attenuated from any questionable order or direction made by Officer Leahy earlier that night." Therefore, the trial court reasoned that "the motor vehicle stop was proper and based on that improper turn."

Relying on State v. Myers, 442 N.J. Super. 287 (App. Div. 2015), the trial court determined the occupants were properly ordered out of the BMW based on the "burnt" smell of marijuana. The trial court also noted State v. Witt, 223 N.J. 409 (2015), "afford[ed] police officers at the scene the discretion to choose between searching the vehicle immediately, if they spontaneously have probable cause to do so, or hav[ing] the vehicle removed and impounded and seek[ing] a search warrant later." It then found there was probable cause to believe marijuana would be found in the car.

Lastly, the court found that Anderson's inability to produce proof of registration or insurance and the fact that he "never attempted to open the glove compartment" justified the warrantless search of the locked glove compartment pursuant to the credentials search exception. The trial court concluded that the State presented sufficient facts to justify a protective search of the BMW, resulting in the permissible seizure of the handguns.

After the denial of the motion to suppress, Gilliard and Evans each pleaded guilty to one count of second-degree unlawful possession of a handgun without a permit.

## II.

Gilliard makes the following arguments on appeal:

POINT I

THE STOP AND THE SEARCH WERE UNCONSTITUTIONAL BECAUSE THE STOP WAS PRETEXTUAL AND UNREASONABLE.

A. Officer Griffeth did not have reasonable suspicion.

B. Alternatively, if reasonable suspicion existed [on] the record, it did so only [for a] de minimis traffic violation, which could not support [the] stop because [the] stop was clearly pretextual and such stops are unconstitutional under our state constitution.

    1. First Approach: Finding pretextual traffic stops unconstitutional under our state constitution.

    2. Second Approach: Using an equal protection framework.

POINT II

[GILLIARD'S] CONVICTION FOR POSSESSION OF A HANDGUN WITHOUT A PERMIT MUST BE VACATED BECAUSE NEW JERSEY LICENSING LAWS ARE FACIALLY UNCONSTITUIONAL (Not Raised Below).

A. Under Bruen[2], New Jersey's licensing scheme and criminal statute, as written and enforced at the time of the purported offense, is unconstitutional. Therefore, his conviction must be vacated.

---

[2] N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022).

B.    New Jersey law precludes all persons under the age of 21 from obtaining a permit to carry a handgun, in violation of the second and fourteenth amendments. Thus, Gilliard's Conviction for Possession without a Permit Must Be Vacated.

C.    These constitutional challenges are not waived.

Evans articulates similar arguments on appeal as follows:

POINT I

THE EVIDENCE SEIZED FROM THE CAR IN WHICH EVANS WAS A PASSENGER MUST BE SUPPRESSED BECAUSE THERE WAS NO REASONABLE SUSPICION TO STOP THE CAR, NO EXCEPTIONS TO THE WARRANT REQUIREMENT APPLY, AND THE SEARCH IS INVALIDATED BY THE LAW LEGALIZING MARIJUANA.

A.  The officers had no reasonable suspicion to stop the car.

B.  The warrantless search of the car cannot be excused by the automobile exception.

C.  The warrantless search of the glove compartment cannot be excused by the credential-search exception.

D.  The odor of marijuana cannot provide probable cause for the warrantless search because the law legalizing marijuana demands retroactive application.

It is well established that our review of a trial court's decision on a motion to suppress following an evidentiary hearing is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). In using a deferential standard of review, we "uphold the

11

factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Cohen, 254 N.J. 308, 318 (2023) (citing Ahmad, 246 N.J. at 609). We are bound to defer "to those findings in recognition of the trial court's 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting Ahmad, 246 N.J. at 609). We "ordinarily will not disturb the trial court's factual findings unless they are 'so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Goldsmith, 251 N.J. 384, 398 (2022). However, we are not bound by a trial court's determination of a strictly legal question. See State v. O.D.A.-C., 250 N.J. 408, 425 (2022). Therefore, "[a] trial court's legal conclusions and its view of 'the consequences that flow from established facts,' are reviewed de novo." State v. Nyema, 249 N.J. 509, 526-27 (2022) (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

When the motion court hears testimony in addition to reviewing an audio and video recording of the stop,[3] an appellate court's own review of the video recording must not be elevated over the factual findings of the trial court. See State v. S.S., 229 N.J. 360, 374-76 (2017).

---

[3] The video recording of the traffic stop and the investigative detention was made from Griffeth's vehicle and body-worn camera.

A.    The Alleged Reasonable Articulable Suspicion to Stop the BMW.

We first examine the relevant circumstances to determine whether Leahy had a reasonable and articulable suspicion to believe that the BMW and the occupants were engaged in criminal activity. Under the United States and New Jersey Constitutions, a warrantless search by police officers is presumptively invalid unless the State proves the search is justified by an established exception to the warrant requirement. Cohen, 254 N.J. at 319. If the State fails to prove such an exception applies, the evidence seized must be suppressed. Ibid.

Reasonable suspicion is defined as "a particularized and objective basis for suspecting a person stopped of criminal activity." State v. Pineiro, 181 N.J. 13, 22 (2004) (quoting State v. Stovall, 170 N.J. 346, 356 (2002)). There must be "some objective manifestation that the person [detained] is, or is about to be engaged in criminal activity." Ibid. (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). When determining whether reasonable suspicion exists, a reviewing court must consider "the totality of the circumstances — the whole picture." State v. Nelson, 237 N.J. at 554 (quoting Stovall, 170 N.J. at 361).

Applying these general principles, we conclude Leahy did not have reasonable articulable suspicion to order Griffith to stop the BMW. The record and video surveillance footage shows the traffic stop was more than an investigatory stop. Leahy's order was based on an alleged motor vehicle

13

infraction and defendant's "suspicious behavior" which do not support reasonable suspicion. See State v. Rosario, 229 N.J. 263, 276-77 (2017). We acknowledge Leahy's testimony concerning his observations in a high-crime location is relevant to the totality of circumstances; however, more was required "than simply invok[ing] the buzz words 'high-crime area' in a conclusory manner to justify [the order] for [an] investigative stop[]." Goldsmith, 251 N.J. at 404. We also note the motion judge did not find reasonable suspicion based on Leahy's observations.

We next address defendant's argument that the traffic stop was based upon pretext, and therefore, unlawful. An investigatory stop must be "based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." Nyema, 249 N.J. at 527 (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). Reasonable suspicion requires "a particularized and objective basis for suspecting the person stopped of criminal activity." State v. Stovall, 170 N.J. 346, 356 (2002).

Generally, an officer observing a traffic violation has probable cause to stop a vehicle. State v. Bacome, 228 N.J. 94, 103 (2017). Moreover, the State must show by a preponderance of the evidence that the particular facts objectively supported the officer's reasonable suspicion. State v. Alessi, 240

N.J. 501, 518 (2020); State v. De Lorenzo, 166 N.J. Super. 483, 488 (App. Div. 1979).

The State contends the stop was lawful based on the failure to give the appropriate signal when turning under N.J.S.A. 39:4-126, and the failure of the BMW to come to a complete stop under N.J.S.A. 39:4-144. However, Griffeth acknowledged that he stopped the BMW at Leahy's direction. Therefore, the trial court's finding was not supported by the record. Moreover, no testimony was elicited that the BMW's turn affected the traffic. See State v. Williamson, 270 N.J. Super. 318, 320-22 (App. Div. 1994).

The trial court rejected defendant's argument that the stop was pretextual and concluded the traffic stop was based on Griffeth's observation of the motor vehicle's infractions. The court cited State v. Barrow, 408 N.J. Super. 509 (App. Div. 2009), stating: "The fact that the justification for the stop was pretextual [was] irrelevant. Even the slightest motor vehicle violation provides a basis for the stop." The court determined the "intervening acts of those motor vehicle infractions [did] not invalidate the stop." We disagree and conclude the trial court erred in its application of Barrow.

Here, there was a direct nexus between the traffic stop and Leahy's radio call to stop the BMW. Griffeth waited for the BMW, which supported his testimony that he intended to comply with Leahy's order and stop the BMW.

15

Although Griffeth observed the BMW commit the motor vehicle violations, we hold the motor vehicle violations were not attenuated from Leahy's order. Thus, the traffic violations were not independent intervening events. Having engaged in a fact-sensitive inquiry, we conclude the State failed to show by a preponderance of the evidence that the stop of the BMW was objectively supported by the officer's reasonable suspicion.

We also consider the foreseeability and spontaneity of the traffic stop. The automobile exception authorizes a warrantless search of a vehicle when police officers have probable cause to believe the vehicle contains contraband or evidence of an offense and the circumstances giving rise to probable cause are "unforeseeable and spontaneous." Witt, 223 N.J. at 448-50. Following Witt, we have explained warrantless on-the-scene searches of motor vehicles are permitted in circumstances where: "(1) the police have probable cause to believe the vehicle contains evidence of a criminal offense; and (2) the circumstances giving rise to probable cause are unforeseeable and spontaneous." State v. Rodriguez, 459 N.J. Super. 13, 22 (App. Div. 2019).

Recently, in State v. Smart, 253 N.J. 156 (2023), our Supreme Court closely examined the unforeseeable and spontaneous requirement in affirming the suppression of evidence seized from the search of the car where the police failed to obtain a warrant. The Court ruled a warrant was required in an

16

investigative stop where the circumstances giving rise to probable cause were not unforeseeable and spontaneous as required by Witt. Id. at 173.

In Smart, the Court held the stop was not "unforeseeable and spontaneous," stating:

> Here, the police actions that led to the warrantless search of the GMC were not prompted by the "unforeseeability and spontaneity of the circumstances giving rise to probable cause." Witt, 223 N.J. at 414 (quoting State v. Alston, 88 N.J. 211, 233 (1981)). The opposite occurred. Indeed, the investigative stop was deliberate, orchestrated, and wholly connected with the reason for the subsequent seizure of the evidence.
>
> [Id. at 172 (citations reformatted).]

Under Smart and Witt, probable cause pursuant to the automobile exception must "aris[e] from unforeseeable and spontaneous circumstances." Smart, 253 N.J. at 174; Witt, 233 N.J. at 450. The facts from the suppression hearing show Griffeth's stop of the BMW was not "unforeseen and spontaneous." Instead, the facts establish that Griffeth's presence at the intersection of Ridge Avenue and Springwood Avenue was orchestrated by Leahy's direct and deliberate order to stop the BMW.

B.     The Search of the BMW and the Occupants.

Probable cause, moreover, did not ripen to search the car or occupants after the stop. In New Jersey, a lawful traffic stop does not necessarily give rise

17

to a personal or full automobile search. State v. Pierce, 136 N.J. 184, 205, 208-10 (1994); State v. Roman-Rosado, 462 N.J. Super. 183, 196 (App. Div. 2020). A full vehicle search requires a showing of probable cause of the presence of contraband or reasonable suspicion that an occupant is dangerous and may gain access to weapons. State v. Gamble, 218 N.J. 412, 426 (2014); Roman-Rosado, 462 N.J. Super. at 196.

There was insufficient evidence in the record to show reasonable articulable suspicion for the search of the occupants or probable cause for the search of the BMW. Prior to the passage of Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act (CREAMMA), N.J.S.A. 24:6I-31 to -56, in 2021, the smell of marijuana provided sufficient probable cause for an officer to search a car and its passengers. State v. Mandel, 455 N.J. Super. 109, 114-15 (App. Div. 2018). This matter predates CREAMMA, so had Griffeth made the stop based solely on the traffic violations, the smell of marijuana would have provided sufficient probable cause. However, based on the events as noted above, we hold the smell of marijuana was mere pretext for the officers' warrantless search.

Evans concedes CREAMMA was passed after the stop challenged in the suppression motion but argues for retroactive application of the statute. That argument lacks merit. First, we have previously held CREAMMA requires

18

prospective application. State v. Cambrelen, 473 N.J. Super. 70, 76 n.6 (App. Div. 2022). Additionally, the imperative language, "shall take effect immediately," applicable to N.J.S.A. 2C:35-10(c) signified a prospective application. L. 2021, c. 16, § 87(a)(1); State v. Lane, 251 N.J. 84, 96 (2022). Moreover, our Supreme Court has held the Act "has no bearing" on a search that "predated the passage of CREAMMA." Cohen, 254 N.J. at 328.

We are similarly not persuaded that Sangi had probable cause to search the BMW because the vehicle registration was not produced. Sangi was unaware that Anderson had not produced the registration or the insurance card prior to the search of the occupants and the car. Griffeth did not conduct a search of a limited area of the BMW based on Anderson's inability to produce the registration. See State v. Johnson, 476 N.J. Super. 1, 13 (App. Div. 2023). Rather, he told the occupants the car would be searched for "weed." Griffeth could have searched the Department of Motor Vehicles database to determine the BMW's ownership prior to the stop and subsequent search but did not do so.

We are also not convinced the search was for the officers' safety. Neither Griffeth nor Sangi saw furtive gestures from any occupant to justify a sweeping search or any actions that "gave rise to an articulable suspicion suggesting criminal activity." Nyema, 249 N.J. at 530; Goldsmith, 251 N.J. at 405-06. In fact, the record shows the occupants were compliant.

Lastly, Gilliard's movement was restricted from the moment Sangi arrived because Sangi stood by the side of the BMW where Gilliard was seated. See Rosario, 229 N.J. at 272. Also, from the moment of the stop to the arrest, Evans's movement was restricted. While Sangi testified that he was "concerned" because the BMW "came from a location that just had a shooting prior to" the traffic stop, the shooting occurred approximately twenty-two hours before the stop, and there was no evidence adduced in the suppression hearing that identified any of the occupants as being involved in the shooting or armed and dangerous.

We, therefore, conclude the traffic stop was not unforeseeable and spontaneous but was a pretextual, "deliberate," and "orchestrated" stop based on the "sequence of interconnected events" that began with the radio transmission. Smart, 253 N.J. at 172. The totality of the circumstances establish that the officers stopped the BMW to investigate a shooting. Everything thereafter was a pretext to look for guns. Thus, the subsequent search of Gilliard, Evans, and the BMW and seizure of the handguns were illegal; and the handguns should have been suppressed.

C.    Alleged Unconstitutionality Under Bruen.

Gilliard also argues his conviction for possession of a handgun without a permit should be vacated because the New Jersey law is "facially

unconstitutional" under <u>Bruen</u>. Gilliard has misread the holding in <u>Bruen</u>. We conclude Gilliard does not have standing to raise this argument.

We considered and rejected the same argument in <u>State v. Wade,</u> 476 N.J. Super 490, 511 (App. Div. 2023). In <u>Wade</u>, we held "that the justifiable need requirement in N.J.S.A. 2C:58-4(c) (2018) was severable and the remaining provisions of N.J.S.A. 2C:58-4 (2018), as well as N.J.S.A. 2C:39-5(b)(1), were constitutional and enforceable." <u>Id.</u> at 511. Gilliard has incorrectly presumed he "would have been granted a permit but for one potentially invalid provision of a permit statute." <u>Id.</u> at 507. Based on that legal principle, we reject Gilliard's argument that New Jersey's gun permit scheme was unconstitutional.

Reversed, vacated, and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION