**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0478-24

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

ODEANNE S. LAWES,

     Defendant-Respondent.

_____

Argued March 11, 2025 – Decided April 2, 2025

Before Judges Gilson, Firko, and Bishop-Thompson.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 23-05-0614.

Monica do Outeiro, Assistant Prosecutor, argued the cause for appellant (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Monica do Outeiro, of counsel and on the brief).

Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for respondent (Jennifer N. Sellitti, Public Defender, attorney; Alyssa Aiello, of counsel and on the brief).

PER CURIAM

On leave granted, the State appeals from an order suppressing evidence of a controlled dangerous substance (CDS) seized by law enforcement pursuant to defendant Odeanne Lawes's consent to search his motor vehicle after a lawful traffic stop. After a review of the record and the applicable legal principles, we conclude that given the totality of the circumstances, detectives had a reasonable suspicion defendant had committed a crime, possession of a CDS, to justify a request for consent to conduct a warrantless search his vehicle. We, therefore, reverse the September 20, 2024 order granting defendant's suppression motion, vacate the stay, and remand for further proceedings consistent with this opinion.

I.

We glean the relevant facts from the testimony of New Jersey State Police (NJSP) Detectives Derek Jenkins and Joshua Bernard during the two-day evidentiary hearing on the motion to suppress. On November 28, 2021, detectives from the NJSP Drug Trafficking Unit (DTU) learned from a confidential informant (CI) that defendant had allegedly been selling CDS— "cocaine, heroin, and pills" in Ocean County because the CI claimed he previously purchased heroin from defendant. The CI provided information about defendant: his phone number; his employment at a restaurant in Brick

Township; and a description of his vehicle, a 2015 black Audi with New York license plates. The CI also told detectives how defendant obtained the drugs. According to the CI, "[defendant drove] to a source in [New York City] to pick up his large quantities of drugs when he [traveled][,] . . . he [used] his black Audi . . . to make the trip."

The detectives corroborated defendant's telephone number and the vehicle's registration to defendant. When shown a photograph of defendant by detectives, the CI confirmed defendant's identity as the "right suspect." The detectives then determined the CI was "credible and reliable." Further investigation revealed where defendant was employed or was a part owner of the Caribbean restaurant in Brick Township.

During the week of November 28, 2021, detectives surveilled defendant and his vehicle in the restaurant's parking lot. On a single night, detectives observed defendant engage in what "appeared to be [] narcotics transaction[s]" with two separate vehicles that had "pulled up" into the parking lot. Each time defendant exited the restaurant's rear door, retrieved "something from inside his vehicle" parked in the parking lot, approached the other vehicles, and "interact[ed]" with the occupants. Detectives did not see any "hand-to-hand" transactions because the observations were made at night, and the detectives

3

were located in the "dark" in the rear of the parking lot. Based on their training and experience, each interaction "appeared to be a narcotics transaction" because "multiple things" were given to defendant, money transactions were "perceived," and "an item was thrown into the passenger seat of the vehicles before the vehicle departed by [defendant]."

Also, during that same week, detective saw the Audi driven by another person pickup defendant from the rear of the restaurant. Defendant locked the back door and got in the rear passenger seat. Defendant's vehicle traveled from the restaurant in Brick to an automotive garage in Toms River. The vehicle drove into the garage and a "short time" later, defendant exited the garage and drove to Jackson. Defendant traveled through neighborhoods and took "multiple turns" and "alternate paths that weren't the most fast or the fastest or the most direct route."

Detectives applied for and obtained a thirty-day warrant to place a GPS tracking device on defendant's car. That warrant was granted on December 9, 2021, and the tracker was installed on defendant's vehicle.

The detectives then had the CI set up a "controlled buy" of CDS with defendant in the rear of the restaurant. They saw defendant exit the restaurant, go to his vehicle, "pop" the hood, retrieve a "small item," and enter the

4

passenger's side of the CI's vehicle. Defendant and the CI interacted for a "few moments." Defendant exited the CI's vehicle and entered the rear of the restaurant. The CI exited the parking lot, met with detectives, confirmed the transaction had occurred with the detectives, and turned over the "suspected CDS."

On December 17, 2021, detective saw defendant's vehicle leave the restaurant and tracked it as it traveled directly to and from the Bronx within two-and-a half hours. Jenkins testified that he found defendant's actions particularly suspicious because the CI had previously informed the detectives that defendant would drive to New York to buy CDS. Jenkins testified that based on his training and experience, "it [is] a common habit where traffickers will go to source cities to supply the large quantities of drugs, enter the city [,] and then try to exit before being noticed."

Jenkins notified all members of the DTU that defendant was traveling to New York. Unable to quickly get close to New York, the detectives were "staggered" along the Garden State Parkway (GSP) in separate, unmarked vehicles after learning defendant had departed New York and crossed the George Washington Bridge at approximately 2:30 p.m. Jenkins, along with two other detectives, began to follow defendant at mile post 120, Laurence

5

Harbor/Matawan, on the GSP. Jenkins was approximately a quarter of a mile ahead of defendant as he traveled south and approached exit 105. Jenkins, however, did not see whether defendant was driving the vehicle.

Bernard testified that he was present during the surveillance of the restaurant and the controlled buy of the CDS with the CI. He also testified Jenkins advised the DTU that the GPS tracker monitored defendant's travel from Brick to the Bronx with a "very quick turnaround[,]" returning to New Jersey. Bernard drove north on the GSP and positioned his vehicle at mile post 120. Like Jenkins, Bernard was unable to see if defendant was driving the Audi because of the tinted windows.

According to Bernard, the Audi drove past his unmarked car traveling southbound on the GSP around exit 105. Defendant was "erratically" driving—speeding and slowing down. When the car neared exit 105, defendant was in "the far[-]left lane," "switch[ed] over two lanes abruptly" to the right without signaling, "[drove] over a solid white line," and exited the GSP at exit 105 towards Highway 36. Bernard saw a "civilian" vehicle already exiting 105 "slam" on the brakes and "quickly" slow down to avoid a collision.

The "collective" DTU, supervisors and other detectives at the scene, determined defendant was a "danger on the roadway." Based on Bernard's

6

proximity to defendant's vehicle and that his vehicle has the "best light package," it was decided that Bernard would stop defendant's vehicle. Defendant was stopped on Highway 36 at the Tinton Falls/Eatontown border. Bernard positioned his vehicle right behind defendant's vehicle. Another officer stopped his unmarked vehicle behind Bernard's vehicle. None of the detectives' vehicles were equipped with a motor vehicle recorder. Nor were the detectives wearing body-worn cameras because it was not standard operating procedure at that time.

Bernard, in plain clothes, approached defendant's vehicle on the passenger's side. After identifying himself as a NJSP officer, Bernard asked defendant for his driving credentials. Defendant complied, which enabled Bernard to identify defendant as the suspect in their investigation. Defendant was told he was stopped for his "erratic driving," his "careless speed," "not using his signals," and for almost causing a motor vehicle accident as he exited the GSP. Bernard described defendant's demeanor as "nervous" and not making eye contact "at all" during the interaction.

When defendant was asked where he was coming from, he replied: "New York." When asked what he was doing in New York, defendant stated that he went to New York to pick up beef patties. Bernard followed with further questions why defendant would travel to New York for beef patties when there

A-0478-24

was a Restaurant Depot minutes away from their motor vehicle stop. Defendant then became "agitated." At that point, Bernard read defendant his Miranda[1] rights from a Miranda waiver card. Defendant stated that he understood those rights.

Defendant then offered to show Bernard the beef patties in his vehicle. In response to defendant's offer, Bernard asked defendant for consent to search his vehicle before Bernard looked in his vehicle. Bernard pulled out the NJSP consent to search form from his vest pocket. When defendant said "yes" that he would grant consent, Bernard asked defendant to step out of his vehicle.

While standing in front of his vehicle with defendant, Bernard completed the NJSP consent form and reviewed it with him. Defendant "looked [the form] over," confirmed that he understood the form, and signed the form. The consent form permitted detectives to conduct a "complete search" of the Audi, which included "any bags, containers, trunk, and engine compartment." The form noted the search began at 4:11 p.m. and ended at 4:45 p.m.

Thereafter, another detective conducted a search of defendant's vehicle and found cocaine in the engine compartment. Defendant was arrested and taken

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0478-24

into custody. He was charged with and subsequently indicted for first-degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5(b)(1), and third-degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1).

Defendant moved to suppress the cocaine seized from his vehicle. After hearing the testimony from Jenkins and Bernard and the parties' arguments, the trial court issued a written opinion on September 10, 2024, granting defendant's motion to suppress. The court credited the detectives' testimony regarding the traffic stop but nonetheless concluded that the cocaine had been unlawfully seized in violation of defendant's Fourth Amendment rights. In doing so, the court found "[d]efendant was detained due to the officers' reasonable suspicion that the [d]efendant had violated laws regarding the operation of a motor vehicle." Relying on State v. Carty, the court explained the first prong was not satisfied—a request for consent to search made during a motor vehicle stop be supported by "reasonable and articulable suspicion to believe that an errant motorist . . . has engaged in, or is about to engage in, criminal activity." 170 N.J. 632, 647 (2002). The court further explained: "Given the totality of the circumstances, the [detectives'] request to search the vehicle was not based on information obtained during the motor vehicle stop." This appeal followed.

## II.

On appeal, the States argues the trial court's suppression order should be reversed. The State contends the trial court limited its factual analysis to only those facts following the motor vehicle infractions observed by the detectives and failed to conduct a totality of the circumstances analysis, thereby misapplying Carty.

Our review of a motion to suppress is deferential. State v. Nyema, 249 N.J. 509, 526 (2022). "When reviewing a trial court's decision to grant or deny a suppression motion, appellate courts '[ordinarily] defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record.'" State v. Smart, 253 N.J. 156, 164 (2023) (alteration in original) (quoting State v. Dunbar, 229 N.J. 521, 538 (2017)). "Those findings warrant particular deference when they are 'substantially influenced by [the trial judge's] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Rockford, 213 N.J. 424, 440 (2013) (citations omitted) (alteration in original); see Balducci v. Cige, 240 N.J. 574, 594-95 (2020); see also State v. McNeil-Thomas, 238 N.J. 256, 271 (2019).

Factual findings "should be overturned 'only if they are so clearly mistaken that the interests of justice demand intervention and correction.'" State

v. Boone, 232 N.J. 417, 426 (2017) (State v. Elders, 192 N.J. 224, 244 (2007)). "A . . . court's legal conclusions, however, and its view of 'the consequences that flow from established facts,' are reviewed de novo." Nyema, 249 N.J. at 526-27 (citing State v. Hubbard, 222 N.J. 249, 263 (2015)).

The parties do not dispute the lawfulness of the traffic stop based on defendant's "erratic" driving and motor vehicle infractions. Accordingly, we focus our analysis on whether, under the totality of the circumstances, a reasonable and articulable suspicion existed at the time defendant provided the consent to search his vehicle.

"The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution equally guarantee '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" Dunbar, 229 N.J. at 532 (alteration in original) (quoting U.S. Const. amend. IV; N.J. Const. art. 1, ¶ 7). During a motor vehicle stop due to a traffic violation, "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez v. United States, 575 U.S. 348, 354 (2015). To prolong the stop "beyond the time required to complete the stop's mission," an officer

must possess an "articulable reasonable suspicion independent from the reason for the traffic stop." Dunbar, 229 N.J. at 540.

In Carty, our Supreme Court established the reasonable and articulable suspicion standard governing consent searches of vehicles. The Court explained:

> consent searches following a lawful stop of a motor vehicle should not be deemed valid . . . unless there is reasonable and articulable suspicion to believe that an errant motorist or passenger has engaged in, or is about to engage in, criminal activity. In other words, . . . unless there is a reasonable and articulable basis beyond the initial valid motor vehicle stop to continue the detention after completion of the valid traffic stop, any further detention to effectuate a consent search is unconstitutional.
>
> [170 N.J. at 647.]

The Court further explained the reasonable suspicion requirement has the "prophylactic purpose of preventing the police from turning a routine traffic stop into a fishing expedition for criminal activity unrelated to the stop." Ibid.

Reasonable suspicion is defined as "a particularized and objective basis for suspecting [a] person stopped of criminal activity." State v. Pineiro, 181 N.J. 13, 22 (2004) (quoting State v. Stovall, 170 N.J. 346, 356 (2002)). "There must be 'some objective manifestation that the person [detained] is, or is about to be engaged in criminal activity.'" Ibid. (alteration in original) (citation and

internal quotation marks omitted). "Although reasonable suspicion is a less demanding standard than probable cause, '[n]either "inarticulate hunches" nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights.'" State v. Goldsmith, 251 N.J. 384, 399 (2022) (quoting Stovall, 170 N.J. at 372 (Coleman, J., concurring in part and dissenting in part)).

Thus, a reviewing court must consider "the totality of the circumstances—the whole picture" when determining whether reasonable suspicion existed at the time of the traffic stop. State v. Nelson, 237 N.J. 540, 554 (2019) (quoting Stovall, 170 N.J. at 361). It "must not engage in a 'divide-and-conquer' analysis by looking at each fact in isolation." Id. at 555 (citation omitted). Additionally, the reasonable suspicion inquiry weighs the officers' background and training that permits them "'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."'" Ibid. (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).

In considering the lawfulness of the consent search here, the trial court found Bernard's request for consent to search defendant's vehicle ran "afoul" of defendant's rights. The court also found that the first prong in Carty had not

been satisfied because the consent request was not based on information obtained during the traffic stop given the totality of the circumstances. We hold the court erred in reaching that legal determination.

We defer to the factual findings made by the trial court accrediting the detectives' testimony regarding the basis for the traffic stop. However, we disagree with the trial court's legal conclusion finding the totality of the circumstances did not give rise to a reasonable and articulable suspicion that defendant had engaged in criminal behavior under Carty. We conclude Bernard's request for defendant's consent to search the vehicle was based on a reasonable and articulable suspicion that defendant had engaged in criminal wrongdoing.

In reaching that conclusion, we consider together all of these facts in the record concerning defendant's: (1) suspected activity as a dealer of CDS in the Brick Township area; (2) participation in and the detectives' observations of two separate suspected drug transactions in the rear of the restaurant parking lot; (3) alternate routes taken by the Audi between Brick and Toms River; (4) actions providing probable cause for the GPS tracking device; (5) sale of CDS to the CI in a controlled buy; (6) "quick turnaround" travel from Brick to the Bronx in two-and-and one-half hours; (7) erratic driving on the GSP; (8) near collision

14

with another vehicle when abruptly exiting the GSP; (9) nervousness and inability to maintain eye contact when interacting with Bernard; and (10) agitation when questioned about traveling to New York to purchase beef patties. The detectives' testimony established a link between defendant, his vehicle, the suspected drug activity in New York, as well as defendant's actions and responses during the traffic stop. Thus, Bernard's reasonable and articulable suspicion and request for defendant's consent to search the vehicle was based on objective "cumulative factors in a totality of [the] circumstances." Elders, 192 N.J. at 250.

Having reviewed the record and considered the totality of the circumstances, we conclude both detectives provided a timeline and context for the investigation, surveillance, GPS tracking, and defendant's consent to search request. We further conclude the trial court mistakenly focused only on facts learned after the vehicle stop. The totality of the of the circumstances can include, and in this case should have included, facts already know to the police officers. See Stovall, 170 N.J. at 357 (explaining that the reasonable suspicion analysis involves a consideration of "the events which occurred leading up to the stop").

15

Accordingly, we reverse the order granting defendant's suppression motion and direct that the trial court enter an order denying the motion to suppress. We remand for further proceedings consistent with this opinion. We also vacate the stay of the trial court proceedings pending this appeal.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

16                                                                    A-0478-24